Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
2512 SE 25th Ave., Suite 304
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

*Attorney for Proposed Defendant-Intervenors*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

**MARION COUNTY,** a Political Subdivision of the State of Oregon,

Plaintiffs

v.

**U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL,** in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers**,**

Defendants.

Case No. 6:26-cv-00956-MC

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER AND NATIVE FISH SOCIETY'S MOTION TO INTERVENE AS DEFENDANT-INTERVENORS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

MOTION ........ 1

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. The Corps' Operation of the WVS is Causing the Continued Decline of UWR Chinook Salmon and Steelhead ........ 3

II. The Current Litigation ........ 7

ARGUMENT ........ 8

I. Conservation Organizations are Entitled to Intervene as of Right ........ 8

A. This Motion is Timely ........ 9

B. Conservation Organizations and Their Members Have Significant Protectable Interests in Preserving UWR Chinook Salmon and Steelhead ........ 10

C. Disposition of This Case May Impair or Impede Conservation Organizations' and Their Members' Abilities to Protect Their Interests. ........ 13

D. The Existing Parties May Not Adequately Represent the Interests of Conservation Organizations and Their Members. ........ 15

II. Alternatively, Conservation Organizations Should be Granted Permissive Intervention ........ 17

A. The Threshold Requirements for Permissive Intervention Are Met ........ 18

B. This Court Should Exercise Its Discretion and Allow Intervention ........ 19

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

### Cases

*Arakaki v. Cayetano*,
324 F.3d 1078 (9th Cir. 2003)....................15, 17

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*,
712 F.3d 1349 (9th Cir. 2013)....................18

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011)....................9, 10, 14, 15, 17

*Cnty. of Fresno v. Andrus*,
622 F.2d 436 (9th Cir. 1980)....................16

*Donnelly v. Glickman*,
159 F.3d 405 (9th Cir. 1998)....................18

*Forest Conservation Council v. U.S. Forest Serv.*,
66 F.3d 1489 (9th Cir. 1995)....................13, 17

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995)....................9, 12, 16

*Kalbers v. U.S. Dep't of Just.*,
22 F.4th 816 (9th Cir. 2021) ....................9

*Kootenai Tribe of Idaho v. Veneman*,
313 F.3d 1094 (9th Cir. 2002)....................18, 20

*M-J-M-A- v. Hermosillo*,
822 F.Supp.3d 1147 (D. Or. 2026)....................2

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
479 F.Supp.3d 1003 (D. Or. 2020) ....................2, 3, 4, 11

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,*
558 F.Supp.3d 1056 (D. Or. 2021) ....................2, 5, 12, 17

*Sagebrush Rebellion Inc. v. Watt*,

713 F.2d 525 (9th Cir. 1983)....13, 14

*Smith v. Los Angeles Unified Sch. Dist.*,

830 F.3d 843 (9th Cir. 2016)....9

*Spangler v. Pasadena City Bd. of Educ.*,

552 F.2d 1326 (9th Cir. 1977)....18, 19

*United States v. City of Los Angeles*,

288 F.3d 391 (9th Cir. 2002)....10

*W. Watersheds Project v. Haaland*,

22 F.4th 828 (9th Cir. 2022) ....9

*Wilderness Soc'y. v. U.S. Forest Serv.*,

630 F.3d 1173 (9th Cir. 2011)....9, 10, 13, 19

**Rules**

Fed. R. Civ. P. 24(a)....3, 8, 9, 10, 13, 14, 15, 17

Fed. R. Civ. P. 24(b)....3, 8, 18, 19, 20

**Other Authorities**

U.S. Army Corps of Engineers, Supplemental Environmental Impact Statement (June 26, 2026)

https://www.nwp.usace.army.mil/WVS-EIS/....2

## MOTION

Proposed Intervenors Northwest Environmental Defense Center and Native Fish Society move for leave to intervene as a matter of right in this action or, in the alternative, permission to intervene, for the purposes of defending against Plaintiff's lawsuit. Pursuant to Local Rule 7-1(a)(1), Proposed Intervenors contacted counsel for Plaintiff multiple times but were unable to obtain their position on this motion. Federal Defendants take no position on the motion.

## INTRODUCTION

Plaintiff Marion County filed suit in May 2026, alleging that the U.S. Army Corps of Engineers ("Corps") and its senior leadership violated the Administrative Procedure Act ("APA") by failing to submit to Congress a report on the effects of turbidity from certain dam operations on tributaries to the Willamette River. Compl. (ECF 1). After the City of Salem filed a similar lawsuit that raised a wider range of claims, *City of Salem v. United States of America*, No. 6:26-cv-1381-MTK, ECF 1 (July 8, 2026), Plaintiff subsequently amended its complaint to include twelve claims for relief that also challenge the Corps' recent decision adopting operational measures to benefit salmon and steelhead at its dams that comprise the Willamette Valley System ("WVS"). Am. Compl. at 29–61 (ECF 9). This case seeks an injunction to set aside that decision and stop the Corps from conducting a deep drawdown of the reservoir at Detroit Dam, even though the National Marine Fisheries Service ("NMFS") determined that the drawdown is necessary to provide long-overdue fish passage at Detroit Dam for Upper Willamette River ("UWR") Chinook salmon and steelhead, which are protected under the Endangered Species Act ("ESA").

Proposed Intervenors Northwest Environmental Defense Center and Native Fish Society (collectively, "Conservation Organizations") move to intervene in this case to protect their

interests in native fish populations, critical habitat, sustainable fisheries, and thriving river communities. For years, Conservation Organizations have worked to protect UWR salmonids. In 2018, they sued the Corps over its operation of WVS dams and held the Corps accountable for its substantial and longstanding violations of the ESA. *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 479 F.Supp.3d 1003 (D. Or. 2020) ("*NEDC v. Corps I*"). As a result, Judge Hernández issued an injunction in 2021 that imposed major changes to dam operations to reduce harm to UWR salmonids. *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,* 558 F.Supp.3d 1056 (D. Or. 2021) ("*NEDC v. Corps II*"). That injunction required deep drawdowns of other dam reservoirs and remained in place, with ongoing oversight from Judge Hernández, until last year.

Pursuant to that injunction, in 2024, NMFS issued a Biological Opinion ("2024 BiOp") under the ESA that required the Corps to continue implementing most of those operational changes along with various other requirements, including deep drawdowns of reservoirs during the fall to improve juvenile downstream passage and survival rates. *See* Am. Compl. ¶¶ 233–237 (admitting that the 2024 BiOp "requires" the Corps to implement the drawdown). Such drawdowns are necessary to prevent incredibly high mortality of juvenile salmonids, which struggle to navigate full reservoirs to reach safe dam passage routes, which are far below the reservoir surfaces. *NEDC v. Corps II*, 558 F.Supp.3d at 1064–65. While the drawdown will mobilize some sediment, the Corps will implement mitigation measures to minimize turbidity levels and their potential effects in the North Santiam River, which were thoroughly analyzed in the Corps' Supplemental Environmental Impact Statement ("SEIS").[1]

[1] *See* https://www.nwp.usace.army.mil/WVS-EIS/ (listing such measures and linking to copies of the SEIS, 2024 BiOp, and other relevant documents) (last visited July 28, 2026). The Court may take judicial notice of this information. *See M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1181, n. 8 (D. Or. 2026) (taking judicial notice of "discussion" on agency website).

Because Plaintiff seeks to derail the deep drawdown for Detroit Dam that is a critical measure for improving juvenile fish passage and survival, Conservation Organizations seek to intervene in this case. They are entitled to intervene as of right under Federal Rule of Civil Procedure 24(a) because their motion is timely, they have long-standing interests in protecting UWR salmonids, those interests could be harmed by a decision in Plaintiff's favor, and the Corps will not adequately represent their interests. Alternatively, the Court should exercise its discretion and grant permissive intervention because Conservation Organizations also meet the requisite test under Federal Rule of Civil Procedure 24(b).

## BACKGROUND

### I. The Corps' Operation of the WVS is Causing the Continued Decline of UWR Chinook Salmon and Steelhead.

The Corps operates thirteen dams as part of the WVS on the Willamette River's major tributaries, including the North and South Santiam Rivers, the McKenzie River, and Middle Fork of the Willamette River. *NEDC v. Corps I*, 479 F.Supp.3d at 1008. Congress authorized the WVS for flood control, hydropower, fish and wildlife, recreation, and water supply purposes. *Id*. The Willamette River and its tributaries provide migratory, spawning, and rearing habitat for UWR Chinook salmon and steelhead, which are listed as threatened under the ESA. *Id*. These fish are born in freshwater, often in upstream tributaries, migrate through the Willamette River to the ocean to mature into adults, and then return to their natal streams to spawn. *Id*.

Although UWR Chinook and steelhead were listed as ESA threatened species in 1999, which triggered various substantive and procedural obligations under the ESA, the Corps did not complete "consultation" with NMFS and obtain "take" coverage for its operations until after Proposed Intervenor NEDC sued the Corps and NMFS under the ESA. *Willamette Riverkeeper v. Corps*, No. 3:07-cv-01399-PK, ECF 1 (Sept. 20, 2007); *id*. ECF 19 (February 26, 2008);

Declaration of Karl Anuta ¶ 4 (filed herewith). In 2008, NMFS issued a Biological Opinion ("2008 BiOp") that found the Corps' operation of the WVS was likely to jeopardize UWR Chinook and steelhead by, *inter alia*, impeding downstream passage of juveniles and upstream passage of adults. *NEDC v. Corps I*, 479 F.Supp.3d at 1009.

The WVS harms and kills salmonids in many ways. On the North and South Santiam Rivers, about 70% of historic Chinook and 33% of historic steelhead spawning habitat is blocked by dams. *Id*. Dam reservoirs also harm juvenile salmon by trapping them in stagnant water, where they are exposed to higher than natural levels of predation, parasites, disease, and poor water quality. *Id*. To avoid such substantial harm, NMFS's 2008 BiOp imposed a Reasonable and Prudent Alternative ("RPA") that included 96 operational, structural, and other measures to, *inter alia*, improve fish passage at the dams by deadlines. *Id*. at 1009–10, 1012–14.

But the Corps failed to implement many of these measures, leading Conservation Organizations to file a second lawsuit, which alleged that the Corps had violated the ESA by jeopardizing the continued existence of UWR Chinook salmon and steelhead, causing unlawful "take" of these listed species, and failing to reinitiate consultation with NMFS. *NEDC v. Corps I*, 479 F.Supp.3d at 1010–11; *see also* Declaration of Jennifer Fairbrother ¶ 15 (filed herewith); Anuta Decl. ¶ 5. This Court ruled for Conservation Organizations on all three of their ESA claims, granting their summary judgment motion. *NEDC v. Corps I*, 479 F.Supp.3d at 1027.

In that ruling on the merits, Judge Hernández made several critical findings that are relevant to this case. He found that the Corps "failed to carry out several of the most important RPA measures," including timely fish passage, and NMFS had determined that lack of passage is "one of the single most significant adverse effects on both fish and their habitat." *Id*. at 1012, 1014. As a result, "[f]ar short of moving towards recovery, the Corps is pushing the UWR

Chinook and steelhead even closer to the brink of extinction." *Id*. at 1017. "[T]he Corps' operation of the [WVS] without completing the RPA measures is causing the species' decline," and thus jeopardizing the species' existence. *Id*. at 1018. Furthermore, the Corps' discretionary operations of the dams resulted in unlawful "take" of these fish by, *inter alia*, causing 71% mortality of juvenile salmon that passed through Detroit and Big Cliff dams on the North Santiam River. *Id*. at 1022–23. Additionally, the Corps unlawfully and "significant[ly] delay[ed]" reinitiating consultation with NMFS even though it should have "identified means to mitigate those harms by [doing so] sooner." *Id*. at 1025, 1027.

As a remedy, Judge Hernández, after obtaining extensive briefing and expert opinions from Conservation Organizations and appointing a neutral expert, issued an injunction that required the Corps to implement a large suite of operational, structural, and other measures to improve fish passage and water quality until NMFS issued a new BiOp. *NEDC v. Corps II*, 558 F.Supp.3d at 1075–79. The injunction was necessary because the Corps' "failure to provide adequate fish passage" was causing "substantial, irreparable harm" that was evident from the species' "continuing decline." *Id*. at 1064. Because impacts to "power production, recreation, and local economies do not overcome the presumption that the balance of harms and public interest factors tip" in favor of ESA-listed species, an injunction was warranted. *Id*. at 1066.

Relevant here, additional fish passage measures were necessary because the Corps' proposal for weaker measures did not "adequately address the lack of volitional fish passage," which is biologically necessary. *Id*. at 1064. Judge Hernández found that Conservation Organizations' proposed measures, including deep drawdowns of multiple reservoirs, "represent the most effective means for providing safe fish passage under current dam configurations." *Id*. "The biological justification for these operational measures is relatively straightforward." *Id*. To

help with successful migration to the ocean, deep drawdowns reduce the size of the reservoirs and lower their elevation, allowing juvenile salmon to reach the dams in a faster and safer manner and then access regulating outlets on the dam face, which are much lower in elevation but safer to pass through than the hydroelectric turbines. *Id*. at 1064–65. Despite the Corps' argument to the contrary, this Court found that the Corps possessed the legal authority to implement deep drawdown measures despite impacts to hydropower production. *Id*. at 1066–74.

Judge Hernández's injunction was extensive and concluded that "[i]t is abundantly clear that changes to the Corps' operation of the [WVS] are necessary to avoid irreparable harm." *Id*. at 1075. The injunction ordered the Corps to carry out certain interim measures, and ordered additional measures to be developed by an expert panel (that included Conservation Organizations' experts) that would "hammer out the details and propose implementation plans" for more complicated measures. *Id*. at 1076. The injunction required completion of ESA consultation with NMFS by December 31, 2024; implementation of interim measures "to the greatest extent practicable under existing hydrologic conditions and necessary flood control operations" with "every effort to comply with the various water quality standards;" bi-annual status reports; and deep drawdowns of certain dams. *Id*. at 1076–1079.

Between July 2021 when the injunction was issued and July 2025 when final judgment was entered, the Expert Panel submitted, and the Court approved, a slew of implementation plans; the Corps filed its biannual status reports that largely demonstrated compliance with the injunction; and the parties addressed many issues that arose. *E.g.*, *NEDC v. Corps*, No. 3:18-cv-437-HZ, ECF 232 (Nov. 29, 2021) (approving amendment to injunction to incorporate plan for deep drawdown of Cougar Reservoir), ECF 242 (Feb. 28, 2022) (first biannual status report), ECF 247 (March 21, 2022) (Conservation Organizations' response to status report).

One issue that arose involved the deep drawdown of Green Peter Reservoir on the South Santiam River that occurred in fall 2023, which led to high levels of turbidity that impacted downstream water users and communities and violated state water quality standards. *Id*. ECF 292-1 at 39–44 (Feb 28, 2024). The Corps responded to this issue by studying, refining its approach to the deep drawdown and coordinating with affected communities, and developing mitigation measures to reduce turbidity impacts. *Id*. ECF 314 (August 20, 2024) (proposed revision to Green Peter drawdown implementation plan). Judge Hernández adopted the Corps' proposed amendments to the implementation plan for the Green Peter deep drawdown despite opposition from the Cities of Albany and Sweet Home, and incorporated the Corps' proposals to develop an emergency action plan and to pause or terminate the drawdown "if downstream drinking water facilities are unable to meet water supply demands or if a public health emergency is declared (e.g., city issues boil water notifications, do not use declaration, or water restrictions)." *Id*. ECF 320 at 1, 9–10 (Sept. 24, 2024). The fall 2024 drawdown was halted early pursuant to that plan when turbidity rose to problematic levels. Fairbrother Decl. ¶ 17. Plaintiff was granted intervention in that case and was a party throughout these proceedings. *NEDC v. Corps*, No. 3:18-cv-437-HZ, ECF 26 (September 25, 2018).

## II. The Current Litigation.

On May 13, 2026, Plaintiff filed a lawsuit in this Court challenging the Corps' failure to submit to Congress the turbidity report required in the 2024 WRDA. Compl. Plaintiff alleged that the Corps violated the APA and acted *ultra vires* by failing to submit the turbidity report ordered by Congress, depriving Plaintiff of information that would have been relevant to its comments on the draft SEIS. *Id*. ¶¶ 95–131. After the City of Salem filed a separate lawsuit that also seeks to stop the Detroit drawdown, *City of Salem v. United States of America*, No. 6:26-cv-

1381-MTK, ECF 1 (July 8, 2026), Plaintiff amended its complaint, which now alleges twelve different claims under the APA, the ESA, the National Environmental Policy Act, the National Historic Preservation Act, the Clean Water Act, and Corps regulations. Am. Compl. ¶¶ 141–304. The Amended Complaint challenges the Corps' Record of Decision ("ROD") for the ongoing operation and maintenance of the WVS, along with the SEIS that analyzed the environmental impacts of that decision. *Id.* ¶¶ 175–304. Although those documents are broad, the relief sought by Plaintiff is narrowly focused on stopping the deep drawdown at Detroit Dam. *Id.* Prayer for Relief ¶¶ B–H (seeking to "[p]rohibit Defendants from beginning any deep drawdown at Detroit Lake" under most requests for relief).

## ARGUMENT

This Court should grant Conservation Organizations' Motion to Intervene as defendants in this case for two independent reasons. First, Conservation Organizations are entitled to intervene as of right under Federal Rule of Civil Procedure 24(a). Second, regardless of whether Conservation Organizations are entitled to intervene as of right, they should be permitted to intervene under Federal Rule of Civil Procedure 24(b).

### I. Conservation Organizations are Entitled to Intervene as of Right.

Conservation Organizations are entitled to intervene in this matter to protect their interests in UWR Chinook salmon and steelhead, their habitat, sustainable fisheries, and thriving river communities in the Willamette River Valley. Federal Rule of Civil Procedure 24(a)(2) requires a court to grant intervention as of right to anyone who (1) submits a timely motion to intervene, (2) "claims an interest relating to the property or transaction that is the subject of the action," (3) "is so situated that disposing of the action may as a practical matter impair or impede [their] ability to protect [their] interest," and (4) is not adequately represented by the existing

parties. Fed. R. Civ. P. 24(a)(2); *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). In evaluating these requirements, a court "normally follow[s] practical and equitable considerations and construe[s] the Rule broadly in favor of proposed intervenors" because "a liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (internal quotation marks and citations omitted). Conservation Organizations meet all of Rule 24(a)(2)'s criteria to intervene as of right.

**A. This Motion is Timely.**

Because no substantive motions or rulings have yet occurred in this case, Conservation Organizations' motion is timely. Courts consider three factors to determine whether a motion to intervene is timely: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 822 (9th Cir. 2021) (internal quotation marks and citations omitted). The "second timeliness factor, prejudice to existing parties, is 'the most important consideration in deciding whether a motion for intervention is untimely.'" *W. Watersheds Project v. Haaland*, 22 F.4th 828, 838 (9th Cir. 2022) (quoting *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 857 (9th Cir. 2016)). Timeliness is a fact-specific inquiry, "determined by the totality of the circumstances." *Smith*, 830 F.3d at 854; *see also Kalbers*, 22 F.4th at 823.

The litigation here is in its early stages. The Court has not yet made any substantive rulings. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (finding the fact that the intervention motion was filed before any rulings on substantive matters weighed in favor of timeliness). Indeed, nothing has happened in this case except the filing of the Complaint and Amended Complaint, and a motion for an extension of the answer deadline, so

granting intervention would not cause disruption or delay in the proceedings. *See Citizens for Balanced Use*, 647 F.3d at 897 (finding that a motion made "at an early stage of the proceedings," will neither prejudice other parties nor delay the proceeding). Thus, Conservation Organizations' intervention would not prejudice any party.

Conservation Organizations have not delayed in seeking intervention. Less than three months have passed since Plaintiff filed its complaint and less than two weeks since its amended complaint, and the Corps has not answered Plaintiff's complaint yet. Conservation Organizations promptly filed this motion before any further action happened in the case. Because this request for intervention is timely, Conservation Organizations meet the first requirement for intervention as of right under Rule 24(a).

### B. Conservation Organizations and Their Members Have Significant Protectable Interests in Preserving UWR Chinook Salmon and Steelhead.

Conservation Organizations and their members have significant protectable interests in defending critical fish passage measures for UWR salmonids in the North Santiam River that this case seeks to stop. An applicant for intervention has an interest in an action if (1) "the interest is protectable under some law" and (2) "there is a relationship between the legally protected interest and the claims at issue." *Wilderness Soc'y*, 630 F.3d at 1176 (citation modified). Whether this requirement is met is a "practical, threshold inquiry, and no specific legal or equitable interest need be established." *Citizens for Balanced Use*, 647 F.3d at 897 (citation modified). This requirement is "a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *United States v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (citation omitted).

Conservation Organizations and their members have well-established, long-standing interests in protecting and restoring native salmon and steelhead species in the Willamette River

and its tributaries, and reducing harm to those species from dam operations on tributary streams like the North Santiam River. *See* Fairbrother Decl. ¶¶ 2–15, 21–25 (describing Native Fish Society's "long history of advocating for the protection and recovery of spring Chinook salmon and winter steelhead in Oregon's Upper Willamette River Basin" and past advocacy for more protective fish operations); Anuta Decl. ¶¶ 2–6, 12–29. Conservation Organizations and their members have worked hard to promote actions that would benefit these species by improving their habitat and migratory routes, including the operational measures at issue in this case. Fairbrother Decl. ¶¶ 11–16, 21; Anuta Decl. ¶¶ 4–6, 28–29.

This interest in preserving and recovering threatened UWR Chinook salmon and steelhead is legally protectable. ESA, 16 U.S.C. § 1531(b) ("The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ."); *see NEDC v. Corps I*, 479 F.Supp.3d at 1018, 1023, 1027 (finding that the Corps' discretionary operation and maintenance of the WVS violated the ESA due to impacts to UWR Chinook and steelhead). The interest in these species directly relates to Plaintiff's claims that seek to stop the Corps' plan to draw down Detroit reservoir starting in Fall 2026, which is required to improve fish passage. *See* Am. Compl., Prayer for Relief ¶¶ B–H.

As explained above, Conservation Organizations' advocacy work included two lawsuits that held the Corps accountable for its substantial violations of the ESA, resulted in an extensive injunction that forced implementation of long-overdue operational measures, including deep drawdowns at dams, and secured the completion of NMFS's 2024 BiOp that requires implementation of the deep drawdown at Detroit Dam, which is at the center of this lawsuit. *See supra* at 3–7. Conservation Organizations sought deep drawdowns as a key fish passage measure

for juvenile fish, which NMFS ultimately required in its 2024 BiOp, and the Corps adopted in its 2026 ROD, including for Detroit Dam. Conservation Organizations engaged in the original EIS and SEIS processes by submitting comments on draft EIS documents to urge the Corps to carry out the deep drawdown at Detroit Dam. *See* Fairbrother Decl. ¶¶ 13–14; Anuta Decl. ¶¶ 5–6.

Conservation Organizations have extensive knowledge of UWR Chinook and steelhead, the history of the Corps' ESA violations, and subsequent remedial operations like deep drawdowns. Many details about the prior litigation that spurred these drawdowns, and implementation of the drawdowns during the injunction, will be important for the Court to understand. Conservation Organizations' extensive knowledge will be helpful for the Court given that Plaintiff's amended complaint largely ignores these critical issues, and the Corps' attorneys in this case were not involved in the prior case, which spanned more than seven years.

For example, Plaintiff's complaint suggests that the potential harm to economic and recreational interests trumps the proven harm to UWR salmonids, ignoring the holding in the prior case that "impacts to power production, recreation, and local economies" do not outweigh the Congressional interest in protecting ESA-listed species. *NEDC v. Corps II*, 558 F.Supp.3d at 1066; *contrast* Am. Compl. ¶¶ 68–84. Plaintiff also ignores that the Corps studied and adopted various mitigation measures for the Detroit deep drawdown to address turbidity concerns based on lessons learned from prior drawdowns. *See* Fairbrother Decl. ¶ 18 (summarizing the "stepwise approach" that the Corps will take which is expected to "minimize" sediment, and direction to cancel, pause, or modify the drawdown if threats to drinking water occur).

Thus, Conservation Organizations are entitled to intervene in order to defend these measures that they fought for several years to secure. *See Idaho Farm Bureau*, 58 F.3d at 1397 ("A public interest group is entitled as a matter of right to intervene in an action challenging the

legality of a measure it has supported.") (citations omitted); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527–28 (9th Cir. 1983) (finding "no serious dispute in this case concerning ... the existence of a protectable interest on the part of" an environmental group that sought to intervene in an action challenging the creation of a conservation area it had supported).

### C. Disposition of This Case May Impair or Impede Conservation Organizations' and Their Members' Abilities to Protect Their Interests.

Intervention is necessary for Conservation Organizations and their members to protect their interests in UWR Chinook salmon and steelhead against impairment by this litigation. Rule 24(a) requires that an applicant for intervention as of right be "so situated that disposing of the action may as a practical matter impair or impede [the applicants'] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2). "Rule 24 refers to impairment as a practical matter. Thus, the court is not limited to consequences of a strictly legal nature." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir. 1995) (citation omitted), *abrogated on other grounds by Wilderness Soc'y*, 630 F.3d at 1177–78, 1180. As with the other prongs of the intervention test, the Ninth Circuit interprets this test liberally in favor of intervention. *See, e.g., Sagebrush Rebellion*, 713 F.2d at 527–28.

Plaintiff's lawsuit, if successful, might impair Conservation Organizations' ability to protect their interests in threatened UWR Chinook salmon and steelhead in the North Santiam River, critical habitat important to rearing and migration of juvenile fish, sustainable fisheries fed by these species, and thriving river communities who depend on sustainable, reliable numbers of fish migrating upstream each year. *See* Fairbrother Decl. ¶¶ 25–29 (describing Native Fish Society's motivation for intervening); Anuta Decl. ¶¶ 9–11, 27–29. Plaintiff seeks an order that prohibits the Corps from conducting the deep drawdown at Detroit Dam. *See* Am. Compl., Prayer for Relief ¶¶ B–H. That prohibition would harm Conservation Organizations and their

members by stopping an action intended to improve the survival of juvenile Chinook salmon and steelhead that are forced to migrate through Detroit reservoir and dam on their way to the ocean. *See* Fairbrother Decl. ¶¶ 19–24; Anuta Decl. ¶¶ 27–29. As a result, stopping the Detroit reservoir drawdown, which is required under NMFS's 2024 BiOp, would hinder Conservation Organizations' members ability to enjoy healthy populations of UWR Chinook salmon and steelhead in the North Santiam River and harvest fish now and in the future as part of a sustainable fishery and thriving river economy. *See* Fairbrother Decl. ¶¶ 4–8, 20–24, 28–29 (describing Native Fish Society's values and members, and how this case will harm their interests); Anuta Decl. ¶¶ 11–29 (describing interests in fish that will be harmed by the case).

Thus, Plaintiff's success in this case threatens to impair Conservation Organizations' ability to protect their interests in UWR salmon and steelhead populations, critical habitat, sustainable fisheries, and thriving river communities. *See Citizens for Balanced Use*, 647 F.3d at 898 (finding that if the plaintiff prevailed in enjoining restrictions on harmful activities in a wilderness area, the proposed intervenors' interest in protecting that area would be impaired); *see also Sagebrush Rebellion*, 713 F.2d at 528 (affirming intervention where an adverse decision would "impair" a group's "interest in the preservation of birds and their habitats").

Additionally, if Plaintiff was to prevail in this case and the court remanded the SEIS and ROD, the Corps might adopt a different approach to the drawdown at Detroit reservoir that is less beneficial to UWR salmonids. This threat also satisfies Rule 24(a)'s "impairment" prong. *See Citizens for Balanced Use*, 647 F.3d at 900 ("We stress that intervention of right does not require an absolute certainty that a party's interests will be impaired. . . . Rule 24(a) is invoked when the disposition of the action 'may' practically impair a party's ability to protect their interest in the subject matter of the litigation . . . .") (quoting Fed. R. Civ. P. 24(a)(2)).

Resolving this litigation without Conservation Organizations may impair their interests, and thus the third prong of the Rule 24(a) test for intervention as of right is satisfied.

**D. The Existing Parties May Not Adequately Represent the Interests of Conservation Organizations and Their Members.**

None of the existing parties adequately represent the interests of Conservation Organizations, fulfilling the fourth and final Rule 24(a) requirement for Conservation Organizations to intervene as of right. "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898 (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)). Courts consider three factors when assessing whether a proposed intervenor's interests are adequately represented by existing parties: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Id.* (quoting *Arakaki*, 324 F.3d at 1086). "The most important factor in assessing the adequacy of representation is how the interest compares with the interests of existing parties." *Id.* (internal quotation marks and citation omitted). "If an applicant for intervention and an existing party share the same ultimate objective, a presumption of adequacy of representation arises. To rebut the presumption, an applicant must make a compelling showing of inadequacy of representation." *Id.* (internal quotation marks and citation omitted). An applicant makes a compelling showing of inadequacy by establishing that the existing parties "will not undoubtedly make all of the proposed intervenor's arguments." *W. Watersheds Project*, 22 F.4th at 841 (citation modified).

Plaintiff cannot adequately represent Conservation Organizations' interests. In fact, Plaintiff's interests are directly at odds with Conservation Organizations' interests: Plaintiff wants to delay or reverse the decision to implement the Detroit reservoir drawdown, and Conservation Organizations want the drawdown plan to remain in place. *See* Fairbrother Decl. ¶¶ 19–21, 25–29 ("Each season of delayed implementation prolongs the dam operations that harm these ESA-listed populations and the interests of our members who depend on their recovery."); Anuta Decl. ¶¶ 27–29. Plaintiff's plea for relief is directly adverse to Conservation Organizations' interests.

The Corps also cannot adequately represent Conservation Organizations' interests for two main reasons. First, the Corps and Conservation Organizations have a history of adversarial proceedings that demonstrate the inadequacy of representation here. As explained in detail above, Conservation Organizations needed to file two lawsuits, prosecute seven years of intense litigation, and secure a court injunction to force the Corps to implement critical fish passage measures, including the deep drawdowns at issue here. *See* Fairbrother Decl. ¶ 26 ("[T]he Corps' failure to implement required measures . . . compelled the Native Fish Society to bring suit in the first instance."); Anuta Decl. ¶¶ 4–6, 29. This demonstrates that the Corps cannot adequately represent Conservation Organizations' interests, warranting intervention. *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1398 (finding federal agency would not adequately represent an environmental group where the challenged agency decision was compelled by that group's prior litigation); *Cnty. of Fresno v. Andrus*, 622 F.2d 436, 439 (9th Cir. 1980) (finding "further reason to doubt" that the Department of Interior would protect intervenor's interest in a rulemaking because "the Department began its rulemaking only reluctantly after [the proposed intervenor] brought a law suit against it").

Second, Conservation Organizations' interests in this case are far narrower than the Corps' interests. *Arakaki*, 324 F.3d at 1087. Due to the agency's diverse responsibilities and obligations under the statutes and authorizations implicated in this case, the Corps is charged with addressing multiple environmental concerns and interests on behalf of the public interest generally. *See, e.g*., *NEDC v. Corps II*, 558 F.Supp.3d at 1066–67 (arguing that its obligation to provide hydropower precluded deep drawdown measures to help ESA-listed fish). Conservation Organizations' and their members' interests focus more narrowly on protecting threatened fish, critical habitat, sustainable fisheries, and thriving river communities. *See, e.g.,* Fairbrother Decl. ¶ 25 ("The Native Fish Society's interest is singular and undivided: the survival and recovery of these fish."). Due to the Conservation Organizations' more focused interests, they will provide different information to the Court and contribute unique perspectives to the arguments and proceedings in this case to further those interests. *See Citizens for Balanced Use*, 647 F.3d at 899 (finding that proposed intervenors' interests in "secur[ing] the broadest possible restrictions" on recreation within public lands and a federal agency's position that "much narrower restrictions would suffice" were "fundamentally different points of view"); *Forest Conservation Council*, 66 F.3d at 1499 (finding intervention was warranted because the defendant agency must "represent a broader view than the more narrow, parochial interests of" the group that sought intervention).

Because Conservation Organizations' interests will not be adequately represented by either Plaintiff or the Corps, the fourth requirement of Rule 24(a) is satisfied and Conservation Organizations are entitled to represent and protect their specific interests.

## II. Alternatively, Conservation Organizations Should be Granted Permissive Intervention.

Regardless of whether Conservation Organizations meet the requirements for intervention as of right, they meet the requirements for permissive intervention under Federal

Rule of Civil Procedure 24(b) and should be allowed to intervene under that rule. Rule 24(b) allows a court to "permit anyone to intervene who[] . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Permissive intervention may be granted when a proposed intervenor (1) demonstrates an independent ground for jurisdiction, (2) files a timely motion, and (3) presents a claim or defense that shares a common question of law or fact with the main action. *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013).

In deciding whether to exercise its discretion to grant permissive intervention, a court should consider several factors, including "the nature and extent of the intervenors' interest, their standing to raise relevant legal issues, . . . whether the intervenors' interests are adequately represented by other parties, . . . and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (footnotes omitted). A court must also consider whether "intervention will unduly delay the main action or will unfairly prejudice the existing parties." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998); Fed. R. Civ. P. 24(b)(3).

**A. The Threshold Requirements for Permissive Intervention Are Met.**

Conservation Organizations meet all of the threshold requirements for permissive intervention. As explained above in the context of intervention as of right, Conservation Organizations' intervention is timely. *See supra* at § I.A. Conservation Organizations intend to respond directly to Plaintiff's requested relief. *See* Proposed Answer (filed herewith). Thus, Conservation Organizations' defenses will address questions of law and fact in common with those raised in Plaintiff's complaint. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094,

1108 (9th Cir. 2002) ("[A]ll that is necessary for permissive intervention is that intervenor's 'claim or defense and the main action have a question of law or fact in common'") (quoting Fed. R. Civ. P. 24(b)), *abrogated on other grounds by Wilderness Soc'y*, 630 F.3d at 1177–78, 1180.

**B. This Court Should Exercise Its Discretion and Allow Intervention.**

This Court should allow Conservation Organizations to intervene in this case due to (1) their long-standing interests in UWR Chinook salmon and steelhead, critical habitat, sustainable fisheries, and thriving river communities; (2) their history of litigation and participation in the administrative process to protect those interests; (3) the risk that none of the existing parties will adequately represent Conservation Organizations' interests; and (4) judicial efficiency. As discussed above in the context of intervention as of right, Conservation Organizations have concerns about harms to downstream migrating juvenile UWR Chinook salmon and steelhead from status quo operations at Detroit Dam and the resulting impacts to fisheries and river community economies. The "nature and extent" of those interests counsels in favor of granting intervention. *Spangler*, 552 F.2d at 1329.

Furthermore, Conservation Organizations have developed a deep familiarity with the factual and legal issues involved in this case through long-running litigation that involved similar issues and participation in the administrative decision-making process at issue in this matter. That familiarity will allow Conservation Organizations to "significantly contribute to full development of the underlying factual issues . . . and to the just and equitable adjudication of the legal questions presented" by this case. *Id.* Intervention should also be granted because of the risk that the existing parties will not adequately represent Conservation Organizations' interests.

Granting intervention to Conservation Organizations will neither "unduly delay or prejudice adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). As discussed

earlier with respect to timeliness in the context of intervention as of right, there have been no substantive rulings in this case, and the parties have yet to file any substantive motions or briefs. Given those facts, there is no threat of prejudice or delay that counsels against intervention.

Given the significant interests of Conservation Organizations in the issues involved in this case, their long history with those issues, and the early stage of the litigation, this Court should exercise its discretion to allow permissive intervention under Rule 24(b). *See Kootenai Tribe of Id.*, 313 F.3d at 1111 (upholding grant of permissive intervention where environmental groups would contribute to the "equitable resolution" of a case given its "magnitude").

**CONCLUSION**

For the foregoing reasons, this Court should grant Conservation Organizations' Motion to Intervene.

Dated: July 30, 2026

s/Lauren M. Rule
Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
2512 SE 25th Ave., Suite 304
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

*Attorneys for Proposed Defendant-Intervenors*