**OLIVIER JAMIN** OSB # 173805
olivierjamin@dwt.com
**KEVIN H. KONO**, OSB # 023528
kevinkono@dwt.com
**VERÓNICA MURIEL CARRIONI**, OSB #213881
veronicamuriel@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AT EUGENE

**MARION COUNTY,** a Political Subdivision of the State of Oregon,

Plaintiff,

And

**SANTIAM WATER CONTROL DISTRICT** and **CITY OF STAYTON,**

Plaintiff-Intervenors

v.

**U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL,** in his official capacity as Secretary of the Army, and **WILLIAM H. GRAHAM, JR.,** in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants.

And

Lead Case No. 6:26-cv-00956-MTK

Trailing Case No.: 6:26-cv-1381-MTK

**PLAINTIFF CITY OF SALEM'S MOTION FOR PRELIMINARY INJUNCTION**

**Oral Argument Requested**

**Expedited Hearing Requested**

**Hearing: October 6, 2026, 9:00 a.m.**

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER** and **NATIVE FISH SOCIETY**,

Defendant-Intervenors.

**CITY OF SALEM,** an Oregon Municipal Corporation,

Plaintiff,

And

**SANTIAM WATER CONTROL DISTRICT** and **CITY OF STAYTON,**

Plaintiff-Intervenors

v.

**UNITED STATES OF AMERICA**, and **UNITED STATES ARMY CORPS OF ENGINEERS**, an agency of the United States government**,**

Defendants,

And

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER** and **NATIVE FISH SOCIETY**,

Defendant-Intervenors.


DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

# TABLE OF CONTENTS

**Page**

L.R. 7-1(A) CERTIFICATION ... 1

MOTION FOR PRELIMINARY INJUNCTION ... 1

MEMORANDUM OF LAW ... 1

I. INTRODUCTION ... 1

II. BACKGROUND ... 3

A. The Willamette Valley System and the North Santiam River Provides a Critical Drinking Water Resource ... 3

B. The Corps Will Conduct a Deep Drawdown of the Detroit Reservoir ... 4

C. The Deep Drawdown Will Imperil Salem's Drinking Water ... 5

D. The Harms from the Deep Drawdown Will be Immediate ... 9

E. Salem Proposed Reasonable Alternatives and Mitigation Measures to Address the Impacts of the Drawdown, Which the Corps Did Not Adequately Consider ... 10

F. The Final SEIS Is Insufficient Under Federal Law ... 12

III. LEGAL STANDARD ... 14

A. Standard for a Preliminary Injunction ... 14

B. Standard Under the Administrative Procedure Act ... 14

IV. ARGUMENT ... 15

A. Salem Is Likely to Succeed on the Merits ... 15

1. The Final SEIS Fails to Comply with the CWA in Violation of the APA (Claim 6) ... 15

2. The Final SEIS Fails to Comply with NEPA in Violation of the APA (Claims 1 and 2) ... 17

a. The Corps failed to take a "Hard Look". ... 18

b. The Corps failed to consider reasonable alternatives. ... 20



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

3. The Corps Failed to Comply with WRDA in Violation of the APA (Claims 4 and 5) ..... 22

B. Salem Is Likely to Suffer Irreparable Harm ..... 24

C. The Balance of Hardships and the Public Interest Favor Granting an Injunction 28

V. FRCP 65 BOND REQUIREMENT ..... 30

VI. CONCLUSION ..... 30






DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ....................14

*Am. Med. Response, Inc. v. City of Stockton*,
2005 WL 2269123 (E.D. Cal. Sep. 16, 2005)....................28

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)....................24

*Boynes v. Limetree Bay Ventures, LLC*,
2023 WL 3166603 (D.V.I. Apr. 28, 2023), *aff'd*, 110 F.4th 604 (3d Cir. 2024)....................26

*Cal. River Watch v. Daggett Cmty. Servs. Dist.*,
2024 WL 5673231 (C.D. Cal. Dec. 10, 2024) ....................27

*California v. Chiquita Canyon, LLC*,
2025 WL 2495534 (C.D. Cal. Aug. 29, 2025)....................28

*Cascadia Wildlands v. Bureau of Land Mgmt.*,
410 F. Supp. 3d 1146 (D. Or. 2019) ....................19

*City of Phila. v. Sessions*,
280 F. Supp. 3d 579 (E.D. Pa. 2017) ....................28

*City of Seattle v. Trump*,
808 F. Supp. 3d 1204 (W.D. Wash. 2025)....................28

*Concerned Pastors for Social Action v. Khouri*,
217 F. Supp. 3d 960 (E.D. Mich. 2016)....................25, 26, 29

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ....................18

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
623 F.3d 633 (9th Cir 2010) ....................21

*Env'tl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ....................21

*Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*,
12 F. Supp. 2d 1121 (D. Or. 1997) ....................15



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

*Hualapai Indian Tribe v. Haaland*,
755 F. Supp. 3d 1165 (D. Ariz. 2024) ........................................................................24

*Idaho Conservation League v. Atl. Gold Corp.*,
879 F Supp 2d 1148 (D. Idaho 2012) ........................................................................26

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ........................................................................18

*Landwatch v. Connaughton*,
905 F. Supp. 2d 1192 (D. Or. 2012) ........................................................................24, 29

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
689 F.3d 1060 (9th Cir. 2012) ........................................................................19, 20

*M.R. v. Dreyfus*,
697 F.3d 706 (9th Cir. 2012) ........................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................15

*Nat'l Ass'n of Mfrs. v. U.S Dep't. of Homeland Sec.*,
491 F. Supp. 3d 549 (N.D. Cal. 2020) ........................................................................27

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ........................................................................24, 25

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
132 F. Supp. 2d 876 (D. Or. 2001) ........................................................................16

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
323 F. Supp. 2d 1037 (N.D. Cal. 2004) ........................................................................27

*Or. Nat. Res. Council Fund v. Goodman*,
505 F.3d 884 (9th Cir. 2007) ........................................................................14

*Or. Wild v. U.S. Forest Serv.*,
819 F. Supp. 3d 1185 (D. Or. 2026), *clarified on denial of reconsideration*, 2026 WL 916346 (D. Or. Mar. 16, 2026) ........................................................................18

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ........................................................................28

*Roman v. Wolf*,
977 F3d 935 (9th Cir 2020) ........................................................................28



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
2009 WL 1575169 (E.D. Cal. May 29, 2009) ....................................................................29

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025)....................................................................................................18

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) .............................................................18, 23, 25, 29

*Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
472 F.3d 1097 (9th Cir. 2006) ......................................................................................25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ........................................................................................28

*United States v. Alisal Water Corp.*,
431 F.3d 643 (9th Cir. 2005) ........................................................................................29

*United States v. City of N. Adams*,
1992 WL 391318 (D. Mass. May 18, 1992)..................................................................25

*United States v. Cow Palace, LLC*,
2024 WL 5147615 (E.D. Wash. Dec. 17, 2024)............................................................26

*United States v. Klamath Drainage Dist.*,
2023 WL 5899910 (D. Or. Sep. 11, 2023)....................................................................24

*United States. v. Midway Heights Cnty. Water Dist.*,
695 F. Supp. 1072 (E.D. Cal. 1988)..............................................................................26

*Viet. Veterans of Am. v. CIA*,
811 F.3d 1068 (9th Cir. 2016) ..................................................................................15, 23

*Western Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ....................................................................................19, 20

*WildEarth Guardians v. USDA Animal & Plant Health Inspection Serv. Wildlife Servs.*,
135 F.4th 717 (9th Cir. 2025) ........................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..........................................................................................................14

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. §706.................................................................. *passim*

Clean Water Act, 33 U.S.C. § 1251 *et seq.*......................................................................... *passim*



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Endangered Species Act, 16 U.S.C. § 1531 .......... 11, 12

National Environmental Policy Act, 42 U.S.C. § 4332 .......... *passim*

Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.* .......... 27

Thomas R. Carper Water Resources Development Act of 2024, Pub. L. No. 118-272, 138 Stat. 2992 (§ 1205) .......... *passim*

**Rules**

FRCP 65(c) .......... 30

**Regulations**

40 C.F.R. § 141.13 .......... 27

OAR 340-041-0004(1) .......... 16

OAR 340-041-0036 .......... 16, 17

OAR 340-041-0007 .......... 16



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

## L.R. 7-1(A) CERTIFICATION

Counsel for Plaintiff City of Salem conferred with counsel for Defendants United States of America and United States Army Corps of Engineers through video conferences, and the parties were unable to resolve the issues.

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff City of Salem ("Salem" or "the City") moves for a preliminary injunction barring Defendants the United States of America and the United States Army Corps of Engineers ("Corps") (collectively "Defendants") from initiating or proceeding with a deep drawdown of Detroit Reservoir until there is a final decision on the merits of this case in order to (1) protect Plaintiff's drinking water supply and the safety of thousands of Oregonians who rely on the City for access to clean drinking water and (2) protect Plaintiff's drinking water infrastructure.

Alternatively, Salem moves for a preliminary injunction requiring Defendants to immediately cease any deep drawdown below 1,450 feet elevation of the Detroit Reservoir the Corps has initiated, whether the drawdown currently planned in November 2026 or any subsequent drawdown, if turbidity levels reach 10 Nephelometric Turbidity Units ("NTU") or more, and to refrain from resuming the drawdown until turbidity levels fall below 10 NTU. The Corps' proposed drawdown will almost certainly result in turbidity levels above this 10 NTU threshold and any turbidity levels above 10 NTU will result in irreparable harm to Salem and the hundreds of thousands of Oregonians who depend on Salem for water.

This motion is supported by the following Memorandum of Law, the concurrently filed Declaration of Jason Pulley ("Pulley Decl."), and the records and files of this case.

## MEMORANDUM OF LAW

## I. INTRODUCTION

This case concerns whether the Corps may proceed with annual deep drawdowns of Detroit Reservoir before adequately addressing the foreseeable threat those operations pose to Salem's drinking water supply, which comes solely from the North Santiam River. The



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

drawdowns the Corps plans to initiate as soon as November 1, 2026, are expected to mobilize sediment, sharply increase turbidity in the North Santiam River to levels well above normal levels, and risks causing catastrophic damage and eventual shut down of Salem's slow sand filtration system, which provides safe drinking water to approximately 220,000 residents and critical public facilities. Salem seeks a preliminary injunction to preserve the status quo with respect to Detroit Reservoir so as to prevent irreparable harm while the Court reviews the Corps' compliance with federal law.

The injunction is warranted for four reasons.

*First*, Salem is likely to succeed on the merits because, in developing its plan for deep drawdowns, the Corps failed to assess compliance with state and federal water-quality standards under the Clean Water Act ("CWA"), failed to take the hard look at environmental consequences, including known adverse impacts, as required by the National Environmental Policy Act ("NEPA"), failed to evaluate reasonable alternatives, and failed to prepare the turbidity report Congress specifically mandated the Corps to complete under the Thomas R. Carper Water Resources Development Act of 2024 ("WRDA") before the Corps could approve the drawdown and therefore acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA").

*Second*, absent relief, Salem faces irreparable harm from turbidity-caused damage to its treatment infrastructure, reduced clean-water capacity, and risks to residents, hospitals, emergency responders, schools, businesses, and state facilities.

*Third*, the balance of hardships favors Salem because, while a deep drawdown creates a probability of making drinking and other water unavailable to hundreds of thousands of citizens, delaying the drawdown simply preserves existing water conditions while the Corps completes the legally required analysis.





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

*Fourth*, the public interest favors an injunction because protecting drinking water, public health, emergency services, and environmental quality outweighs proceeding with an inadequately analyzed interim operation.

Accordingly, the Court should enjoin Defendants from commencing any deep drawdown or, alternatively, at the least require Defendants to cease any drawdown operations if turbidity reaches 10 NTU and prohibit resumption of any such operations until turbidity returns to below that level.

## II. BACKGROUND

### A. The Willamette Valley System and the North Santiam River Provide a Critical Drinking Water Resource

The United States Army Corps of Engineers ("Corps") owns, operates, and maintains the Willamette Valley System ("WVS"), a system of thirteen federally operated dams and reservoirs throughout the Willamette River Basin in Oregon. Pulley Decl., Ex. D (Final Supplemental Environmental Impact Statement) ("Final SEIS") at 25–26. The WVS includes Detroit Dam and Detroit Reservoir on the North Santiam River. *Id*. Water released from Detroit Dam flows downstream through the North Santiam River, which serves as a critical municipal drinking water source for communities throughout the Mid-Willamette Valley, including Salem. Pulley Decl., ¶ 3.

Salem operates the primary regional drinking water treatment facility in the Mid-Willamette Valley (Geren Island Water Treatment Facility) and provides drinking water to approximately 220,000 residents, as well as to hospitals, schools, businesses, and industries. *Id.* ¶ 4. Salem's water service area includes the City of Turner, two water districts, and portions of unincorporated Marion and Polk Counties. *Id.* ¶ 5. Salem is also the sole emergency drinking water source for the City of Stayton and the City of Keizer. *Id*.

As Oregon's capital city, Salem is home to state government offices, the Oregon State Police headquarters, federal offices, correctional facilities, and the Oregon State Hospital, all of





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

which depend on Salem's municipal water supply. *Id.* ¶ 6. Likewise, Salem Hospital system, which is a Level II Trauma Center[1] serving nearly 100,000 patients per year in its emergency department alone[2] and a regional population of over 400,000 people,[3] relies on Salem's drinking water system. *Id.* Salem additionally must maintain sufficient water supplies for firefighting and other emergency response functions. *Id.*

Because Salem relies on the North Santiam River as its principal drinking water source, operational changes at Detroit Dam directly and immediately affect the quality, reliability, and safety of Salem's municipal water supply. *Id.* ¶ 7. Operational changes at Detroit Dam also increase the likelihood of requiring Salem's provision of emergency services to these cities, further negatively impacting regional water supply availability. *Id.* ¶ 8.

**B. The Corps Will Conduct a Deep Drawdown of the Detroit Reservoir**

In 2024, the National Marine Fisheries Service issued its 2024 Biological Opinion ("2024 BiOp"), concluding that existing WVS operations jeopardize threatened salmon and steelhead species, including Upper Willamette River Chinook salmon and Upper Willamette River steelhead. Final SEIS at 37, 54. The BiOp directs the Corps to implement multiple identified alternative measures to protect salmon and steelhead species, including conducting annual deeper drawdowns of Detroit Reservoir as what is described as an "interim" operational measure to facilitate downstream migration of juvenile fish until a long-term solution for downstream fish passage is installed. *Id.* at 54.

In response, the Corps prepared a Supplemental Environmental Impact Statement ("SEIS") for WVS operations and maintenance. The Corps released a draft SEIS in November 2025, accepted public comments through January 13, 2026, and issued the Final SEIS in May

[1] *See* https://www.salemhealth.org/services/trauma-and-general-surgery

[2] *See* https://salemhealth.org/about/salem-hospital-fast-facts

[3] *See* https://en.wikipedia.org/wiki/Salem_Hospital_(Oregon)



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

2026. On June 23, 2026, the Corps certified the Final SEIS for its proposed activities, during which the Corps intends to lower Detroit Reservoir to an elevation of 1,395 feet during late fall and early winter to potentially facilitate downstream fish passage for juvenile salmonids until long-term structural fish-passage facilities are constructed. Pulley Decl., Exs. D, E. The Corps issued a Record of Decision documenting and publishing the Final SEIS on June 23, 2026. Pulley Decl., Ex. E.

The Final SEIS supports the Corps' now-adopted "Interim Operations," which include "a late fall/early winter deep drawdown of Detroit reservoir to an elevation of 1,395 feet for downstream fish passage." Final SEIS at 54. The Final SEIS explains that the Interim Operations are "a suite of independent operations that would occur until the long-term solution for downstream fish passage and water temperature management is in place and operational." *Id.* Although described as "interim," the Final SEIS expressly acknowledges that the Interim Operations "could extend to nearly the 30-year implementation timeframe." *Id.* at 84.

The Final SEIS explains how the Interim Operations will be conducted. The deep drawdown operation would begin "in late November or early December," lower the reservoir to the target elevation "over approximately two weeks," and maintain the reservoir at that elevation for "approximately two weeks." Final SEIS at 54. Full recovery to pre-drawdown elevations could take several months and is, in any event, entirely dependent on hydrologic conditions. *Id.* at 31. The drawdown will use a "step-down approach over several years to go down 55 feet to reach the target elevation of 1,395 feet." *Id.* The first year, the Corps will lower the reservoir thirty feet to reach 1,425 feet. Then, the Corps will "lower the reservoir deeper each year until reaching 1,395 feet." *Id.*

### C. The Deep Drawdown Will Imperil Salem's Drinking Water

The deep drawdown presents substantial and unreasonable risks to Salem's drinking water infrastructure and to the hundreds of thousands of residents and businesses that rely on the North Santiam River for a safe and reliable water supply. Salem does not challenge the goal of



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

protecting threatened salmon and steelhead or the development of long-term fish passage solutions at Detroit Dam. The issue is whether the Corps may implement a recurring deep drawdown—an operation the Final SEIS acknowledges could continue for decades—without first analyzing and mitigating the serious risks to the region's municipal water supply. The deep drawdown will substantially increase turbidity in the North Santiam River, which poses serious operational risks to Salem's water treatment system and threatens the availability of drinking water for Salem's residents. Pulley Decl., ¶ 11.

Salem's drinking water treatment facility relies on a slow sand filtration system designed to treat source water with very low turbidity levels. *Id.* ¶ 9. The facility uses a two-stage slow sand filtration system that cleans drinking water by passing river water slowly through deep sand beds and a biologically active surface layer, which captures and breaks down contaminants. *Id.* The City relies on seven filters, each approximately 2.5 acres in size and six feet deep. *Id.* ¶ 10, Ex. A. Under ordinary conditions, turbidity in the North Santiam River is typically below 10 NTU, allowing Salem's filters to operate for approximately three months between cleaning cycles. *Id.* ¶ 9. During a cleaning cycle, operators conduct a routine scraping process that removes the accumulated solids layer and about 0.25 inches of sand from the top of the filter bed, after which the filters are refilled, biologically matured, and returned to service. *Id.*

The deep drawdown would significantly disturb fine sediments in Detroit Reservoir and downstream channels thereby increasing the concentration of suspended solids and fine particles in the river, likely to well above 50 NTU—more than five times normal turbidity. *Id.* ¶ 11. Prior drawdowns in comparable basins produced sustained turbidity far above 50 NTU. *Id.* Ex. B at 11. Any increase in turbidity above 10 NTUs will negatively impact the operations of Salem's drinking water treatment facility. *Id.* ¶ 11.

The City's engineering analyses, pilot testing, and operational experience demonstrate that elevated turbidity substantially impairs the filtration system. *Id.* ¶ 22, Exs. B–C, F. Increased turbidity levels materially impair filter efficacy and can reduce filter run times from



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

approximately three months to as little as three weeks and, under some conditions, to less than twenty-four hours.[4] *Id*. Ex. C at 4–5. Fine sediments of the type that will be stirred up by the deep drawdown and introduced during high turbidity events can penetrate deeply into the sand filter beds (greatly complicating, or even prohibiting, maintenance and restoration), contaminate the filter media, and require extensive rehabilitation, including removal and replacement of sand media and reconstruction of the biological filtration layer. *Id*. Rehabilitation can take months and cost several million dollars per filter. *Id*.

Turbidity levels exceeding 10 NTUs threaten the operation of Salem's treatment facility and may force the City to close its intake gates to prevent damage to the treatment system. *Id.* If the intake is shut down, Salem must rely on limited backup sources, including groundwater wells, stored reservoir water, and emergency interties with the City of Keizer. *Id.* ¶ 7, Exs. B–C. These alternative sources lack operational redundancy. *Id*. If any component of these alternative supplies (such as the emergency interties with Keizer) fails or is unexpectedly limited during a turbidity event, Salem will be unable to provide adequate drinking water to the region, creating a public health emergency. *Id*. ¶ 7.

Any elevated turbidity could force Salem to impose emergency water restrictions or leave the City unable to provide safe drinking water in compliance with state and federal standards, thereby creating a public health emergency affecting residents, hospitals, emergency responders, and critical public infrastructure. *Id.* ¶ 22. Water shortages—even short-term ones—will lead to serious impacts in the community. For instance, low-income communities may lack resources to obtain alternative drinking water over a prolonged period. In addition, shortages imperil operations at Salem's Hospital, which has a large Emergency Room and Trauma Center and provides services to a region containing over 400,000 people, and impact Salem's ability to fight fires. *Id*. ¶ 6.

---

[4] A "run time" is the time a slow sand filter operates continuously before requiring cleaning.



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Beyond immediate operational concerns and the resulting threat to clean and safe water, the proposed deep drawdown also poses long-term consequences for the region's economic stability and growth. Operating the regional water supply system at or near capacity without redundancy limits Salem's ability to maintain essential services, support residential development, and attract new businesses. The reliability of Salem's water supply is a critical factor in economic development and infrastructure planning throughout the Mid-Willamette Valley. Accordingly, sustained or repeated disruptions caused by annual drawdowns threaten not only Salem's water treatment infrastructure but also the broader regional economy. Salem's reputation and goodwill will be irreparably harmed by the failure to serve a basic municipal function—providing safe drinking water to its residents. If the drawdown causes sustained turbidity events that impair the City's slow sand filtration system, force the shutdown of intake operations, or require boil-water notices or emergency water restrictions, the City will suffer a profound loss of public confidence in its ability to perform one of its most essential governmental functions.

The harms associated with the Detroit drawdown are not speculative. The Corps previously conducted deep drawdowns at other WVS reservoirs, including Green Peter Reservoir, which generated substantial downstream turbidity and caused significant operational disruptions to municipal drinking water systems. *Id.*, Exs. B–C. These prior drawdowns in the WVS produced turbidity levels ranging from approximately 20 NTUs to more than 200 NTUs, *Id.* Exs. B, G, levels that violate Oregon's turbidity standards, statewide narrative criteria, and antidegradation policy. *Id.* ¶ 12. Even though the Corps itself acknowledged the significance of those prior events and the need to incorporate lessons learned into future drawdown planning, the Corps did not actually do so here, and failed to analyze, or even quantify, the potential impacts of the proposed drawdown of the Detroit Reservoir. *See* Final SEIS at 54 (expressly referencing the Green Peter experience and acknowledging that the Green Peter reservoir (another WVS reservoir) drawdown caused high levels of turbidity).





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

In addition, the Final SEIS recognizes that the deep drawdown will cause negative environmental impacts on water supply, water quality, and facility operation of drinking water. Final SEIS at 30. Regarding increased turbidity, the Corps states that these operations "would increase sediment and turbidity levels downstream of Detroit Reservoir because of the deeper drawdown increasing the potential for bank erosion and sloughing," and that "most fine-grained sediment would pass through Big Cliff Reservoir and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns." Final SEIS at 127; *see also* Final SEIS at 30–31 (acknowledging that the drawdown "would adversely affect water supply, water quality, [and] drinking water" because it "would moderately increase sediment and turbidity levels downstream of Detroit Reservoir during the operation"). Despite recognizing these impacts, the Corps did not discuss the actual impacts of increased turbidity.

**D. The Harms from the Deep Drawdown Will be Immediate**

The Corps' proposed "tiered" drawdown—beginning in November and December 2026 with further incremental "step-down" stages over multiple years—will cause immediate harm to Salem's water treatment infrastructure and make Salem unable to provide safe drinking water. Despite this, the Corps failed to address the fundamental risks to the region's drinking water supply because even moderate increases in turbidity can severely damage Salem's slow sand filtration system and force prolonged reductions or stoppages in water production. Pulley Decl., Exs. B–C. Salem's pilot testing concluded that elevated turbidity from Detroit Reservoir drawdowns would severely impair Salem's slow sand filters, with filter run times dropping from about 90 days under normal river conditions to 67 days at 10 NTU, 38 days at 20 NTU, 17 days at 30 NTU, 12 days at 40 NTU, and just 8 days at 50 NTU. *Id*. Ex. F at 4, 6. Repeated exposure further degrades performance, with some later test runs reaching terminal headloss (maximum resistance caused by clogging before the filter must be cleaned) in less than one day, while standard scraping procedures removing 0.25 inches of sand failed to restore filter capacity because solids penetrated deep into the media bed. *Id*. Ex. F at 13–14. Testing showed



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

meaningful recovery of the filter media required removing more than 18 inches of sand media, supporting the conclusion that prolonged turbidity during drawdowns could require months-long rehabilitation and multimillion-dollar replacement efforts, even after only one turbidity event. *Id*.

The step-down approach also does not reduce or prevent prolonged downstream sediment transport, shoreline erosion, or recurring turbidity events following storms. The Final SEIS itself acknowledges that fine sediment mobilized during the drawdown is likely to remain suspended in the river and pass downstream. Final SEIS at 31. At the same time, Salem's emergency measures and approximately $8 million in planned resiliency upgrades remain incomplete and, even when completed, will at best allow it to marginally meet winter demand during the initial drawdown and require relying on emergency water from the City of Keizer, while operating with little or no system redundancy. Pulley Decl., Exs. B–C. If any well, intertie, reservoir component, or backup source fails during the November drawdown period, Salem will be unable to provide sufficient drinking water and fire protection.

### E. Salem Proposed Reasonable Alternatives and Mitigation Measures to Address the Impacts of the Drawdown, Which the Corps Did Not Adequately Consider

Before and during the SEIS process, Salem repeatedly informed the Corps of the risks the proposed drawdown poses. Pulley Decl., ¶ 15. City representatives met with the Corps on numerous occasions, including during a Corps tour of Salem's treatment facility, where the City explained how increased turbidity above 10 NTUs would impair or irreparably damage the filtration system. *Id.*

The City submitted detailed comments on June 20, 2025, prior to the issuance of the draft SEIS. *Id.* ¶ 16, Ex. B. During the public comment period, on January 12, 2026, Salem submitted additional comments. *Id.* ¶ 17, Ex. C. Salem's comments explained the risks of the deep drawdown and that the draft SEIS failed to quantitatively analyze turbidity impacts on downstream drinking water systems and failed to evaluate the operational consequences of elevated turbidity for Salem's slow sand filtration system. *Id*. Exs. B–C. Specifically, the draft





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

SEIS did not analyze specific turbidity level effects on downstream drinking water supply, particularly Salem's treatment plant. *Id*. It also did not evaluate how turbidity thresholds would affect the operation of Salem's slow sand filtration system and, as a result, how turbidity thresholds would affect the availability of drinking water for Salem residents, despite Salem providing the results of laboratory testing that clearly demonstrated how turbidity affects the City's water treatment facility. *Id*.

Salem therefore recommended that the Final SEIS include a turbidity trigger analysis and operational responses—such as pausing the drawdown and restoring normal dam operations—to be implemented if turbidity exceeded certain levels. *Id*. Exs. B–C. The City also proposed several reasonable mitigation measures and alternatives that would reduce risks to downstream water users and mitigate the risk of violating the CWA while still allowing the Corps to pursue its objectives under the Endangered Species Act. *Id*.

*First*, Salem recommended the establishment of a turbidity trigger that would halt drawdown operations if water quality conditions reach unsafe levels. Specifically, Salem requested that the Corps cease drawdown operations and return Detroit Reservoir to normal operating conditions if turbidity in the North Santiam River reaches or exceeds 10 NTU for twelve consecutive hours. *Id*. Ex. C at 6–9. This trigger would provide a clear operational safeguard to protect downstream water users, allow time for turbidity levels to decline, and ensure that Salem's treatment system can recover before additional drawdown activities occur, thereby limiting or eliminating any interruption in drinking water availability and potential damage to the treatment system. *Id*.

*Second*, Salem requested that the Corps evaluate the merits of delaying implementation of the drawdown for one to three years. *Id*. Such a delay would allow the Salem to complete already planned projects and develop additional water supply resiliency measures, including identifying locations, securing funding, and constructing additional groundwater wells capable of

providing sufficient yield during periods when water from the North Santiam River cannot be used due to the turbidity caused by the drawdown *Id*.

*Third*, Salem urged the Corps to prioritize long-term structural solutions for fish passage rather than relying on annual drawdowns as a prolonged, interim operational measure. *Id*. The BiOp and related planning documents identify structural improvements—such as downstream fish passage facilities—as the long-term strategy for supporting threatened fish species. *Id*. Salem requested that the Final SEIS clearly commit to pursuing funding, project planning, and construction of these structural solutions so that annual drawdowns remain only an interim measure. *Id*.

*Fourth*, Salem urged the Corps to incorporate an adaptive management framework with clear decision criteria governing annual drawdowns. *Id*. Such criteria should account for changing circumstances, including variations in regional water demand or failures in critical water infrastructure, and allow drawdown operations to be delayed or modified when necessary to protect public health and safety. *Id*.

### F. The Final SEIS Is Insufficient Under Federal Law

Despite Salem's repeated communications with the Corps discussing the risks of the deep drawdown of the Detroit Reservoir to Salem's regional drinking water treatment facility, the Final SEIS fails to meaningfully address these risks. The Corps did not prepare a turbidity report by January 4, 2026 (and still has not prepared it), as required under WRDA, which report would have informed the Final SEIS. The Final SEIS also does not evaluate how the proposed drawdown will result in violations of Oregon's water quality standards for turbidity, despite knowing that violations of those standards occurred during previous drawdowns.

Likewise, the Final SEIS fails to adequately analyze turbidity impacts on the North Santiam River and downstream drinking water systems. It does not model turbidity concentrations at downstream municipal water supply intakes, including Salem's drinking water



4938-1631-1487v.12 0783034-000019

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

intake on the North Santiam River and does not analyze turbidity thresholds that would impair downstream drinking water treatment facilities.

In addition, the SEIS does not evaluate or even consider several key alternatives to the implementation of the deep drawdown. The Final SEIS states that the "Interim Operations could extend to the 30-year implementation timeframe" under most of the alternatives—including the approved "alternative 5." Final SEIS at 126. However, the Final SEIS expressly states that "Interim Operations are not an alternative," and it does not analyze various potential "Interim Operations" scenarios beyond the Corps' selected approach. *Id*. The SEIS does not evaluate modifications to balance Interim Operations with water safety and supply, including: (1) turbidity-based operational triggers for halting drawdown operations; (2) operational safeguards tied to downstream water quality thresholds; or (3) delays in implementing the drawdown to allow development of alternative municipal water supplies. The SEIS therefore fails to rigorously explore and objectively evaluate reasonable alternatives to the proposed drawdown operations.

The Final SEIS contains these deficiencies despite identifying the "deep drawdown at Detroit Dam" as one of the primary public concerns during both scoping and the draft SEIS comment period. Final SEIS at 299–300. During the scoping period, the Corps received 246 comments, of which 133 were about the deep drawdown. *Id*. During the public comment period, "approximately 65% of respondents opposed the drawdown" and "[t]hose opposed primarily cited concerns over water quality, specifically increased turbidity and the impacts to municipal water supply." *Id.* at 302.

Despite acknowledging that many commenters raised concerns regarding turbidity and impacts to municipal water supplies, the Final SEIS failed to provide a substantive response addressing these comments and analyzing the reasonable alternatives proposed in these comments, including those Salem raised. In fact, the Final SEIS does not evaluate the turbidity





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

thresholds identified in the City's engineering analyses or the potential consequences of treatment plant shutdowns or prolonged interruptions to municipal water supply.

## III. LEGAL STANDARD

### A. Standard for a Preliminary Injunction

A plaintiff has a right to preliminary injunctive relief if it establishes that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When analyzing these elements, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (a preliminary injunction is justified where "there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest").

### B. Standard Under the Administrative Procedure Act

The APA requires federal agencies to engage in reasoned decision-making and to comply with applicable statutory mandates before undertaking major federal actions. A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious where the agency "fails to consider an important aspect of a problem" or offers an explanation "contrary to the evidence." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)). An agency likewise acts arbitrarily and capriciously if it





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks & citation omitted); *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997).

In addition, the APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Courts may do so when "there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action." *Viet. Veterans of Am. v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016) (citation omitted).

## IV. ARGUMENT

### A. Salem Is Likely to Succeed on the Merits

Salem brought six claims against the Corps for failing to comply with the APA, 5 U.S.C. §§ 701–706. Salem is likely to succeed by showing the Final SEIS fails to comply with specific obligations under NEPA, APA, WRDA, and the CWA and, therefore, that the Corps' decision to proceed with the drawdown despite these deficiencies is both arbitrary and capricious and not in accordance with law under APA. In addition, the Corps' failure to prepare the WRDA-mandated turbidity report constitutes a discrete agency action unlawfully withheld within the meaning of 5 U.S.C. § 706(1).

#### 1. The Final SEIS Fails to Comply with the CWA in Violation of the APA (Claim 6)

The Final SEIS fails to analyze whether the proposed drawdown operation would comply with applicable water quality standards under the CWA despite known and foreseeable turbidity impacts. This decision to move forward with the drawdown without evaluating this aspect of the project was arbitrary and capricious under the APA.

The CWA, 33 U.S.C. § 1251 *et seq.*, establishes a comprehensive framework for protecting and restoring national water quality. Section 313 of the CWA requires federal





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

agencies, including the Corps, to comply with state water quality standards. 33 U.S.C. § 1323; *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 132 F. Supp. 2d 876, 889 (D. Or. 2001) (citing cases). "The compliance of the Corps with its legal obligations under the [CWA] is a relevant factor in determining whether the final agency actions taken by the Corps … [are] arbitrary and capricious or otherwise not in accordance with law." *Id.* at 890 (agency acted arbitrarily and capriciously when it failed to consider whether its final agency action was consistent with its legal obligations under the CWA).

Under the CWA, Oregon has adopted water quality standards governing turbidity and degradation of state waters. Oregon's numeric turbidity standard prohibits activities that increase turbidity levels by more than ten percent above upstream background conditions. OAR 340-041-0036. Oregon's statewide narrative criteria further require that deleterious substances, including turbidity, be maintained at the lowest possible levels. OAR 340-041-0007(1). Oregon's antidegradation policy requires protecting existing beneficial uses and preventing unnecessary degradation of water quality. OAR 340-041-0004(1). Oregon law also encourages coordination among federal, state, and local agencies to protect water quality, including through turbidity control measures. OAR 340-041-0007(8).

If implemented as analyzed in the Final SEIS, the deep drawdown of Detroit Reservoir will likely violate the CWA and Oregon's numeric criteria for turbidity, Oregon's statewide narrative criteria, and Oregon's antidegradation policy by increasing turbidity over the maximum ten percent authorized under OAR 340-041-0036. Pulley Decl., ¶ 12. Previous drawdown actions on the Green Peter Dam increased turbidity beyond that level, violating the CWA and Oregon's numeric criteria for turbidity, Oregon's statewide narrative criteria, and Oregon's antidegradation policy. *Id.* ¶ 13. The same outcome is likely here.

Despite these known and acknowledged likely harms, the Final SEIS fails to meaningfully analyze whether the Detroit deep drawdown will comply with the CWA. The Corps failed to model turbidity concentrations at downstream municipal water intakes, failed to



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

analyze turbidity thresholds affecting Salem's slow sand filtration system, failed to evaluate whether the operation would violate Oregon's numeric turbidity criterion in OAR 340-041-0036, which prohibits increases greater than ten percent above background levels, and failed to assess compliance with Oregon's statewide narrative criteria and antidegradation policy. Without this information, the Corps cannot know whether and to what extent the drawdown will comply—or not comply—with Oregon's water quality standards. Instead, the Corps relied on generalized qualitative statements while disregarding substantial evidence submitted by Salem demonstrating that turbidity above approximately 10 NTU threatens Salem's ability to provide safe drinking water to its residents and critical facilities. This failure to analyze whether the drawdown would comply with the CWA was arbitrary and capricious under the APA.

### 2. The Final SEIS Fails to Comply with NEPA in Violation of the APA (Claims 1 and 2)

The Corps failed to prepare a detailed statement analyzing the reasonably foreseeable environmental effects of the deep drawdown and to analyze reasonable alternatives to the manner in which the Corps intends to conduct the operation of the deep drawdown. The Corps' deep drawdown's direct impacts on water quality will affect a significant number of people in the Salem metropolitan area and likely violate water quality standards. Yet, the Corps decided *not* to quantify those impacts or analyze any reasonable alternatives. This failure was unreasonable given the importance of the Detroit reservoir to the water supply. In failing to fully analyze the deep drawdown's impacts and failing to adequately analyze reasonable alternatives, the Corps acted arbitrarily, and Salem therefore is likely to prevail on the merits.

NEPA imposes procedural requirements on agencies before taking final actions that will impact the environment. Before taking "actions significantly affecting the quality of the human environment," agencies must prepare "a detailed statement" including "reasonably foreseeable environmental effects of the proposed agency action" and "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(i), (iii). While agencies should be granted deference regarding the choices made while conducting a NEPA analysis and deciding the actions to take, agency actions must be reasonable. *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182–83, (2025). An agency acts arbitrarily where it decides to not review known important environmental impacts, and such discretion is not entitled to deference and should be reversed. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022–23 (9th Cir. 2007) ("[W]e may reverse the decision as arbitrary or capricious … if the agency … entirely failed to consider an important aspect of the problem"); *Or. Wild v. U.S. Forest Serv.*, 819 F. Supp. 3d 1185, 1204 (D. Or. 2026), *clarified on denial of reconsideration*, 2026 WL 916346 (D. Or. Mar. 16, 2026) ("Courts 'should defer to agencies' decisions about where to draw the line' in the scope of an analysis within a 'broad zone of reasonableness,' but only if the analysis presents reasoned determinations consistent with what NEPA mandates the agency must consider.") (citation omitted); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) ("[A]n agency has the discretion to determine the physical scope used for measuring environmental impacts, [but] the choice of analysis scale must represent a reasoned decision and cannot be arbitrary."). The Corps failed to take the "hard look" NEPA requires.

**a. The Corps failed to take a "Hard Look".**

The Corps violated NEPA by failing to quantify the impacts to water quality due to increased turbidity. NEPA orders federal agencies "to the fullest extent possible," to prepare "a detailed statement on ... reasonably foreseeable environmental effects of [a] proposed agency action." 42 U.S.C. § 4332(2)(C)(i). This requires federal agencies to take a "hard look" at the environmental consequences of the proposed actions prior to implementation by "providing 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

1172, 1194 (9th Cir. 2008); *see also WildEarth Guardians v. USDA Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 730 (9th Cir. 2025) ("If a project may have potentially significant impacts on a local area … the agency must analyze such impacts."). A "'hard look' requires a consideration of 'all foreseeable direct and indirect impacts' and a full assessment of the cumulative impacts of the proposed action." *Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146, 1156 (D. Or. 2019) (quoting *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012)). Moreover, a "hard look" requires "a discussion of adverse impacts that does not improperly minimize negative side effects. General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (citation modified).

The Ninth Circuit's decision in *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011), is instructive. There, the Ninth Circuit held that the Bureau of Land Management violated NEPA because it failed to take the required "hard look" at the environmental consequences of revisions to nationwide grazing regulations. *Id.* at 491. Although BLM's own experts, the Fish and Wildlife Service, the EPA, and state agencies repeatedly warned that the changes would likely harm wildlife, degrade habitat, increase environmental damage, and impair agency oversight, the BLM either ignored or inadequately responded to those comments in the Final EIS. The court concluded that the agency failed to take a "hard look" by failing to meaningfully analyze environmental impacts and failed to explain why contrary expert evidence was rejected.

Here, like in *Western Watersheds*, while the final SEIS acknowledges that the Detroit deep drawdown will increase sediment mobilization and downstream turbidity, the Corps failed to conduct an analysis quantifying the turbidity impacts and what those impacts means for Salem and other downstream drinking water systems. The final SEIS states that the Interim Operations





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

implementing the deep drawdown, "[f]or water quality and drinking water, … would moderately increase sediment and turbidity levels downstream of Detroit Reservoir during the operation" and classifies the turbidity impacts as a "moderately more adverse effect" than the "No Action" alternative. Final SEIS at 31, 127, 135. It also admits that these Interim Operations could extend up to thirty years. Final SEIS at 84. Yet the Final SEIS fails to quantify or meaningfully evaluate foreseeable downstream impacts on Salem's drinking water system and Oregon turbidity standards. It specifically does not model turbidity concentrations at downstream municipal water supply intakes, including Salem's drinking water intake on the North Santiam River; analyze turbidity thresholds that would impair downstream drinking water treatment facilities; evaluate the operational effects of sustained turbidity events on municipal drinking water treatment systems; or analyze how the proposed deep drawdown will result in violations of Oregon's water quality standards for turbidity. The Corps also ignored extensive comments from Salem warning of these impacts and disregarded evidence from prior comparable drawdowns showing substantial turbidity impacts of the drawdown. The Corps' "general statements about possible effects and some risk do not constitute a hard look" at the environmental impacts of the deep drawdown in the North Santiam River. *Western Watersheds*, 632 F.3d at 491 (citation modified). Moreover, the Corps' failure to analyze impacts on Salem's water filtration improperly minimizes adverse harms and nothing in the SEIS adequately justifies that omission. *League of Wilderness*, 689 F.3d at 1075. Accordingly, the decision to implement the deep drawdown was arbitrary and capricious and not in accordance with law.

**b. The Corps failed to consider reasonable alternatives.**

The Corps further violated NEPA by failing to analyze reasonable alternatives to the deep drawdown operation beyond the Corps' selected approach. NEPA requires federal agencies to include in every recommendation for major federal actions "a detailed statement … on … a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a



4938-1631-1487v.12 0783034-000019
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii). Consideration of reasonable alternatives is the "heart" of the NEPA process. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir 2010). "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Id*. (citation omitted); *see also Env'tl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022) (where commenters suggested specific reasonable alternatives for the agencies to consider, "agencies violated NEPA by failing to consider a reasonable range of alternatives").

Here, although the Corps acknowledges that the Detroit Reservoir deep drawdown generated substantial public concern regarding turbidity, downstream drinking water impacts, and municipal water supply reliability, the Final SEIS does not evaluate any alternative operational approaches to the deep drawdown that would reduce those impacts while still advancing the Corps' stated fish-passage objectives. Rather, the Corps only explains in the Final SEIS the specific approach it will take in conducting the drawdown operations without analyzing any other alternative ways of conducting these operations that would lessen the impacts on water quality for Salem.

The Final SEIS does not rigorously analyze alternative interim-operation methods proposed by commenters, including Salem. The Final SEIS does not evaluate several reasonable and technically feasible operational safeguards proposed by Salem, including establishing turbidity based operational triggers requiring cessation of drawdown operations, adopting a turbidity threshold of approximately 10 NTU sustained for twelve consecutive hours measured at the USGS Niagara gauge, evaluating delays of one to three years before implementing the deep drawdown to allow development of additional water supply infrastructure, and prioritizing long term structural fish passage solutions rather than repeated annual deep drawdowns. Together, these proposed measures represent reasonable and practicable alternatives that would allow the



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Corps to pursue compliance with the BiOp while safeguarding the drinking water supply for Salem and the surrounding region and complying with the CWA.

By failing to rigorously evaluate these—or any other—reasonable alternatives, the Final SEIS violates NEPA and deprives decisionmakers and the public of the informed comparison NEPA requires. Accordingly, the decision to implement the deep drawdown was arbitrary and capricious and not in accordance with law.

**3. The Corps Failed to Comply with WRDA in Violation of the APA (Claims 4 and 5)**

The Corps' indisputable failure to prepare a turbidity report as required by WRDA, coupled with its decision to proceed with the deep drawdown without conducting this turbidity report, was arbitrary and capricious under the APA and constitutes a discrete agency action unlawfully withheld within the meaning of the APA.

Recognizing the impacts of high turbidity on water quality, on January 4, 2025, Congress enacted WRDA. Section 1205 requires the Corps to submit a report to Congress by January 4, 2026, concerning "instances of high turbidity in a reservoir in the Willamette Valley resulting from a drawdown in the reservoir." Pub. L. No. 118-272, 138 Stat. 2992, 3071–72 (§ 1205(b)(1)). Congress specifically directed the Corps to: (1) identify prior turbidity incidents associated with reservoir drawdowns; (2) summarize turbidity monitoring records from prior drawdowns; (3) identify lessons learned from prior turbidity events; (4) explain how those lessons would be incorporated into future operations; and (5) identify opportunities to minimize burdens on non-federal entities, such as Salem, caused by increased turbidity. *Id.* at § 1205(b)(2). To date the Corps has not submitted the congressionally mandated report. And, despite this failure, the Corps is proceeding with operations that will result in the exact type of harm Congress acted to prevent.

The Corps' conduct is arbitrary and capricious because the Corps decided to proceed with the deep drawdown without considering the impacts on turbidity as Congress mandated.





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Congress specifically required the Corps to develop this report ***before*** continuing drawdown operations to ensure future operations were adequately informed by past turbidity events and associated impacts. Yet the Corps finalized the Final SEIS and approved operations that include the deep drawdown without preparing the report at all.

That omission is especially significant because the Corps acknowledged in the Final SEIS that the Detroit drawdown would mobilize sediment and increase turbidity downstream, Final SEIS at 30–31, likely affecting drinking water supplies and water quality in the North Santiam River. The Corps also recognized that commenters, including Salem, raised substantial concerns regarding turbidity impacts on municipal drinking water systems. Nevertheless, the Corps failed to undertake or incorporate the very analysis Congress required to address those concerns and failed to evaluate lessons learned from prior drawdowns that produced severe turbidity impacts downstream. The Corps therefore acted arbitrarily and capriciously when deciding to proceed with the drawdown because it "failed to consider an important aspect of the problem," namely the foreseeable turbidity impacts and mitigation measures, that Congress expressly directed it to analyze. *Bosworth*, 510 F.3d at 1023.

The Court should enjoin the drawdown until the Corps produces the report WRDA requires and should compel the Corps to prepare the turbidity report as Congress mandated. Under the APA, courts must compel agency action when the agency has "both a legal duty to perform a discrete agency action and a failure to perform that action." 5 U.S.C. § 706(1); *Viet. Veterans of Am.*, 811 F.3d at 1079. Under this standard, the Corps had a discrete legal duty to "submit" to Congress, by January 4, 2026, a report addressing turbidity impacts associated with Willamette Valley reservoir drawdowns, including identifying prior turbidity events, summarizing turbidity monitoring data, identifying lessons learned, and explaining how those lessons would be implemented in future operations. This is precisely the type of discrete action that is judicially enforceable under § 706(1): Congress imposed a clear obligation, identified the required contents of the report, and established a firm statutory deadline. The Corps nevertheless





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

has failed to prepare or submit the report within the statutory deadline and before approving the Detroit Reservoir deep drawdown. This failure is not merely academic or procedural. The very purpose of the report is to inform how to minimize and mitigate the harms Salem now seeks to prevent. The Corps failed to complete this non-discretional statutory duty, despite acknowledging that the drawdown will mobilize sediment and increase downstream turbidity affecting municipal drinking water supplies. Final SEIS at 30–31. Because the Corps has failed to perform this non-discretionary statutory duty specifically mandated by Congress for multiple reasons—including to inform future drawdown operations and turbidity mitigation—the Corps has unlawfully withheld agency action, and the Court should compel completion of WRDA turbidity report before implementation of the Detroit deep drawdown.

**B. Salem Is Likely to Suffer Irreparable Harm**

If implemented as planned under the Final SEIS, the deep drawdown will likely cause irreparable harm to Salem's drinking water due to the increased turbidity, which Salem will not be able to remediate. "Irreparable harm is harm 'that cannot be redressed by a legal or equitable remedy following trial.'" *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197 (D. Ariz. 2024) (citation omitted). "Irreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018).

To start, increased turbidity from the drawdown and resulting water quality impacts in the North Santiam River will substantially increase risk of non-compliance with CWA standards. Environmental degradation and water-quality impairment constitute irreparable harm. "Environmental injury, by its nature, 'can seldom be adequately remedied by money damages'" and is therefore "often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012); *see also United States v. Klamath Drainage Dist.*, 2023 WL 5899910, at *18 (D. Or. Sep. 11, 2023). Irreparable harm is particularly likely where, absent an injunction,



DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

there will be "[o]ngoing harm to the environment" or where a project "may significantly degrade some human environmental factor." *Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001)).

Additionally, even though the drawdown threatens the human environment by jeopardizing Salem's ability to provide safe drinking water to its residents, the Corps failed to adequately disclose or analyze these resulting adverse impacts on water quality and downstream municipal drinking water systems. "[I]n the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *Bosworth*, 510 F.3d at 1034 (citation omitted). The Corps' failure to take the requisite "hard look" at foreseeable turbidity impacts and failure to consider alternatives supports a finding of irreparable harm. The Corps' failure to complete the turbidity report under WRDA and its failure to consider compliance with the CWA, which would have required the Corps implement alternatives balancing fish-passage with water quality objectives in undertaking the deep drawdown, also support a finding of irreparable harm. *See Nat'l Wildlife Fed'n*, 886 F.3d at 818 (irreparable harm assessed by reference to statutory purposes and established where future environmental injury is likely).

Likewise, Salem is likely to suffer further irreparable harm absent preliminary injunctive relief because the proposed deep drawdown threatens Salem's ability to provide safe and reliable drinking water to its residents and critical public facilities. Loss of access to safe drinking water constitutes irreparable harm because clean tap water is essential to human health and cannot be adequately remedied through monetary damages. *See Concerned Pastors for Social Action v. Khouri*, 217 F. Supp. 3d 960, 972 (E.D. Mich. 2016) ("[T]he public relies every day on the ready availability of safe drinking water at the tap."); *United States v. City of N. Adams*, 1992 WL 391318, at *1–2 (D. Mass. May 18, 1992) ("Substandard drinking water poses an imminent and substantial danger to the health" of consumers and satisfies the irreparable harm requirement);

*United States. v. Midway Heights Cnty. Water Dist.*, 695 F. Supp. 1072, 1077 (E.D. Cal. 1988) ("Substandard water continues to pose an imminent and substantial danger to the health of users."); *United States v. Cow Palace, LLC*, 2024 WL 5147615, at *2 (E.D. Wash. Dec. 17, 2024) (finding irreparable injury where contamination threatened residents' drinking water and public health); *Idaho Conservation League v. Atl. Gold Corp.*, 879 F Supp 2d 1148, 1159 (D. Idaho 2012) (same). The risk of harm extends well beyond ordinary inconvenience because even short-term disruptions to Salem's drinking water supply would imperil the operations of Salem Hospital, as well as Salem's firefighting capabilities and other emergency-response systems. The threatened harm is especially acute for low-income residents and other vulnerable populations who may lack reliable access to alternative water supplies during a prolonged turbidity event. As courts have recognized, the theoretical availability of bottled water or temporary alternatives does not eliminate irreparable harm where residents may lack the means or ability to secure safe water consistently. *See Concerned Pastors*, 217 F. Supp. 3d at 974–77 (finding irreparable harm despite distribution of bottled water and filters because such alternatives were not reliably accessible or effective for all residents); *Boynes v. Limetree Bay Ventures, LLC*, 2023 WL 3166603, at *20–21 (D.V.I. Apr. 28, 2023), *aff'd*, 110 F.4th 604 (3d Cir. 2024) (finding irreparable harm where residents could not afford alternative water sources without sacrificing basic necessities).

In addition, Salem is likely to suffer irreparable harm because the deep drawdown threatens permanent or long-term impairment of Salem's drinking water treatment infrastructure and may force the shutdown of the City's treatment operations altogether. As explained in section II.D. *supra*, Salem's slow sand filtration system is designed to treat raw water with very low turbidity levels and will not be able to adequately treat water with elevated turbidity levels resulting from the drawdown, starting with turbidity as low as 10 NTU. Pulley Decl., ¶¶ 21-22, Ex. F. Rehabilitation of the filters in the water treatment plan would require extensive repairs, which may take months and cost millions of dollars per filter, further constricting water supply.





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

*Id*. Such injuries are irreparable because they threaten public health and the continued operation of essential public infrastructure and are not readily compensable through monetary damages alone. *See Nat'l Ass'n of Mfrs. v. U.S Dep't. of Homeland Sec.*, 491 F. Supp. 3d 549, 570 (N.D. Cal. 2020) (risk of imminent disruption to core operations that cannot readily be quantified or repaired constitute irreparable harms).

Relatedly, this risk of increased turbidity and consequential failure to provide safe drinking water to Salem's population would constitute a violation of Salem's legal obligations as the operator of a public water system under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq*. The SDWA establishes a federally mandated, state-administered regulatory scheme for the protection of drinking water. Its general purpose is to ensure that the water supply systems serving the public meet minimum national standards for protection of public health. *Cal. River Watch v. Daggett Cmty. Servs. Dist.*, 2024 WL 5673231, at *6 (C.D. Cal. Dec. 10, 2024). The SDWA regulates contaminants in drinking water supplied by operators of public water systems, including setting maximum contaminant levels of turbidity. *See* 40 C.F.R. § 141.13. Operators of public water systems like Salem must comply with these maximum contaminant levels. 42 U.S.C. § 300g-3. If Salem is unable to maintain water quality standards or sufficient treatment capacity during the drawdown, it faces the imminent prospect of violating federally enforceable drinking water standards, jeopardizing safe drinking water service to more than 220,000 residents, plus hospitals, schools, and emergency services, and exposing itself to lawsuits for noncompliance, based entirely on the action of the Corps. *See* 42 U.S.C. § 300g-3 (authorizing enforcement actions for non-compliance of the SDWA).

Lastly, the Corps' proposed deep drawdown further threatens substantial and lasting damage to Salem's reputation, public trust, and institutional goodwill because Salem will not be unable to fulfill its duties of providing safe drinking water in the Mid-Willamette Valley. Such injuries are irreparable because damage to reputation and goodwill cannot readily be quantified or remedied through monetary damages. *See Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F.





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Supp. 2d 1037, 1050 (N.D. Cal. 2004) ("Damage to a business' goodwill is typically an irreparable injury because it is difficult to calculate."); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 658 (E.D. Pa. 2017) (municipalities may suffer irreparable reputational harm where government action undermines public confidence and community relationships); *Am. Med. Response, Inc. v. City of Stockton*, 2005 WL 2269123, at *3 (E.D. Cal. Sep. 16, 2005) (suggesting that loss of goodwill or similar intangible harms could support irreparable injury). If Salem residents and regional customers lose confidence in the City's ability to provide safe drinking water, that loss of trust will persist long after any turbidity event subsides, impairing the City's relationships with residents, businesses, and regional partners and undermining long-term economic development and infrastructure planning throughout the region. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (irreparable harm can be found where there is a loss of prospective customers or goodwill).

### C. The Balance of Hardships and the Public Interest Favor Granting an Injunction

Granting an injunction limited to stopping the deep drawdown until the case is decided on the merits will favor the public interest and will not harm the Corps. "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). In analyzing the public interest elements, "courts … consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *California v. Chiquita Canyon, LLC*, 2025 WL 2495534, at *10 (C.D. Cal. Aug. 29, 2025). In balancing the equities, "[c]ourts 'explore the relative harms to [plaintiff] and [defendant], as well as the interests of the public at large.'" *City of Seattle v. Trump*, 808 F. Supp. 3d 1204, 1222 (W.D. Wash. 2025) (quoting


DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)). In addition, "the balance of the harms must be evaluated in light of the nature of the requested injunction." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 2009 WL 1575169, at *23 (E.D. Cal. May 29, 2009).

Here, the public interest favors an injunction halting the deep drawdown because the threatened harm implicates a fundamental public concern: the protection of safe drinking water and public health. "There is no question that the public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental." *United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005); *see also Concerned Pastors*, 217 F. Supp. 3d at 972 ("It is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap," and "[a] safe water supply has always been critical to civilization."). Here, Salem is the sole regional drinking water provider for more than 220,000 residents, hospitals, schools, businesses, and emergency services throughout the Mid-Willamette Valley, all of which will be impacted by the deep drawdown, significantly and adversely impacting the public interest.

The public interest is further reinforced because the proposed drawdown threatens broader environmental harms, including increased sediment transport, shoreline erosion, and degraded water quality. Courts have repeatedly recognized that "[p]reserving nature and avoiding irreparable environmental injury" serves the public interest, *Landwatch*, 905 F. Supp. 2d at 1197, particularly where agency actions threaten "air, soil, and water quality, and wildlife and forest resources." *Bosworth*, 510 F.3d at 1033 ("Moreover, "[i]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment."). Salem seeks only to enjoin the deep drawdown of Detroit Reservoir; any other protection measures the Corps may seek to undertake are unaffected. Preserving the status quo as to Salem's sole source of drinking water pending full judicial review serves the public





DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

interest by protecting both essential drinking water infrastructure and the environmental integrity of the North Santiam River system without harming the Corps.

## V. FRCP 65 BOND REQUIREMENT

FRCP 65(c) requires movants for a preliminary injunction to "give[] security in an amount that the court considers proper." Defendants will not suffer monetary harm if the preliminary injunction is granted. In addition, given the importance of the public interests at issue in the present case and Salem's status as a governmental agency, Salem respectfully requests this Court to waive any bond requirement under FRCP 65(c). In the alternative, Salem requests a bond of $100.

## VI. CONCLUSION

For the foregoing reasons, Salem respectfully requests this Court to grant a preliminary injunction barring Defendants from proceeding with a deep drawdown of Detroit Reservoir until there is a final decision on the merits of this case to protect Plaintiff's drinking water supply and the safety of thousands of Oregonians who rely on the City for access to clean drinking water. At the least, the Court should enter an order requiring Defendants to immediately cease any deep drawdown lower than elevation 1450 feet of the Detroit Reservoir the Corps has initiated, whether the drawdown currently planned in November 2026 or any subsequent drawdown, if turbidity levels reach 10 NTU or more, and to refrain from resuming the drawdown until turbidity levels fall below 10 NTU.

DATED this 21st day of August, 2026.

DAVIS WRIGHT TREMAINE LLP

By: *s/Kevin H. Kono*

Olivier Jamin OSB # 173805
olivierjamin@dwt.com
Kevin H. Kono, OSB # 023528
kevinkono@dwt.com
Verónica Muriel Carrioni, OSB #213881
veronicamuriel@dwt.com
560 SW 10th Ave, Suite 700
Portland, Oregon 97205

Telephone: (503) 241-2300
Facsimile: (503) 778-5299