Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
2512 SE 25th Ave., Suite 304
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
*Attorneys for Defendant-Intervenors*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants,

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Case No. 6:26-cv-956-MTK (Lead Case)
6:26-cv-1381-MTK (Trailing Case)

**DEFENDANT-INTERVENORS' OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**

Defendant-Intervenors.

---

CITY OF SALEM, an Oregon Municipal Corporation,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Plaintiff-Intervenors,

v.

UNITED STATES OF AMERICA, and UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States government,

Defendants,

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

EXHIBIT LIST ........ v

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

I. UWR CHINOOK SALMON AND STEELHEAD—STATUS AND THREATS ........ 2

II. USE OF DRAWDOWNS TO IMPROVE SURVIVAL AND RECOVERY ........ 7

III. THE NEED FOR THE DEEP DRAWDOWN OF DETROIT RESERVOIR ........ 13

ARGUMENT ........ 17

I. PLAINTIFFS' LEGAL CLAIMS HAVE NO MERIT ........ 18

A. Plaintiffs' Challenges to the SEIS and ROD Are Unlikely to Succeed ........ 18

1. Turbidity ........ 18

2. Reservoir Refill and Other Effects ........ 23

3. Alternatives ........ 25

B. Marion County's ESA-Related Claims Make No Sense ........ 25

II. PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM IS LIKELY ........ 26

A. Plaintiffs Lack Evidence that Harm to Drinking Water is Likely ........ 27

B. Other Types of Alleged Harms are Not Irreparable ........ 31

III. THE BALANCE OF HARDSHIPS FAVORS ESA SPECIES OVER ECONOMIC, RECREATION, AND IRRIGATION INTERESTS ........ 33

CONCLUSION ........ 35

**TABLE OF AUTHORITIES**

**Cases**

*Cascadia Wildlands v. BLM*,

No. 6:26-CV-00126-MTK, 2026 WL 2069994 (D. Or. July 17, 2026)............................28

*City of Los Angeles v. Lyons*,

461 U.S. 95 (1983) ............................................................................................27

*Concerned Citizens on I-190 v. Sec'y of Transp.*,

641 F.2d 1 (1st Cir. 1981) ....................................................................................23

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*,

539 F.Supp.3d 543 (D.S.C. 2021)...........................................................................33

*Giftango, LLC v. Rosenberg*,

925 F. Supp. 2d 1128 (D. Or. 2013)...............................................................26, 29, 30

*Gov't of Province of Manitoba v. Zinke*,

273 F.Supp.3d 145 (D.D.C. 2017) ..........................................................................23

*Idaho Wool Growers Ass'n v. Vilsack*,

816 F.3d 1095 (9th Cir. 2016).................................................................................25

*Los Angeles Mem'l Coliseum Comm'n. v. NFL*,

634 F.2d 1197 (9th Cir. 1980).................................................................................31

*Mazurek v. Armstrong*,

520 U.S. 968 (1997) ..............................................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm,*

463 U.S. 29 (1983) ................................................................................................24

*Myers v. BLM*,

No. 13-CV-00701-RM-BNB, 2015 WL 161179 (D. Colo. Jan. 13, 2015)........................30

*Nat'l Ass'n. of Mrfs. v. U.S. Dep't of Homeland Sec*,

491 F. Supp. 3d 549 (N.D. Cal. 2020).......................................................................31

*Nat'l Wildlife Fed'n v. NMFS*,

422 F.3d 782 (9th Cir. 2005)....................33, 34

*Nat'l Wildlife Fed'n v. NMFS*,

831 F.Supp.3d 1012 (D. Or. 2026)....................34

*Nat'l Wildlife Fed'n v. NMFS*,

No. 3:01-cv-0640-SI, 2017 WL 1829588 (D. Or. April 3, 2017), aff'd, 886 F.3d 803, 817 (9th Cir. 2018)....................34

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,

479 F.Supp.3d 1003 (D. Or. 2020)....................5, 6, 17, 18, 26

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,*

558 F.Supp.3d 1056 (D. Or. 2021)....................6, 7, 9, 26, 33, 34, 35

*Protect Our Communities Found. v. Jewell*,

825 F.3d 571 (9th Cir. 2016)....................24

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,

944 F.2d 597 (9th Cir. 1991)....................31

*San Luis & Delta-Mendota Water Auth. v. Salazar*,

693 F.Supp.2d 1145 (E.D. Cal. 2010)....................33, 35

*Savage v. Elevenate, Inc.*,

No. 3:26-CV-00302-AB, 2026 WL 788937 (D. Or. Mar. 20, 2026)....................27, 31

*Seven Cnty. Infrastructure Coal. v. Eagle Cty.*,

605 U.S. 168 (2025)....................19

*TVA v. Hill*,

437 U.S. 153 (1978)....................33

*Weinberger v. Romero-Barcelo*,

456 U.S. 305 (1982)....................32

*Westlands Water Dist. v. U.S. Dep't of Interior*,

376 F.3d 853 (9th Cir. 2004)....................25

*W. Virginia Rivers Coal., Inc v. Chemours Co. FC, LLC*,

178 F.4th 102 (4th Cir. 2026) .......... 29

*Willamette Riverkeeper v. NMFS*,

No. 6:21-cv-00034-AA, 2026 WL 2690278 (D. Or. Sept. 14, 2026) .......... 3, 24, 34

*Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7 (2008) .......... 26

*Yurok Tribe v. U.S. Bureau of Reclamation*,

179 F.4th 663 (9th Cir. 2026) .......... 2

**Statutes**

16 U.S.C. § 1536 .......... 19

16 U.S.C.§ 1538 .......... 19

**Other Authorities**

*Forecast: What does a strengthening El Niño mean for Oregon this winter?* The Oregonian (August 20, 2026), https://reader.theoregonian.com/forecast-what-does-a-strengthening-el-nino-mean-for-oregon-this-winter/content.html .......... 32

| **Exhibit No.** | **Docket No. From Case 3:18-cv-00437-HZ (if applicable)** | **Description** |
|---|---|---|
| 1 | | 2024 5-Year Review: Summary and Evaluation of Upper Willamette River Steelhead Upper Willamette River Chinook Salmon |
| 2 | | Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Willamette Valley System. |
| 3 | 258 | Green Peter Dam Fall Downstream Fish Passage Injunction Measure 2022-04-20 |
| 4 | 278-1 | Lookout Point Dam Fall Downstream Fish Passage (Injunction Measure 16) Implementation Plan |
| 5 | | Abstracts from Willamette Fisheries Science Review (March 3-4, 2025) |
| 6 | | Evaluation of Reservoir Drawdown Effects on Outmigration Behavior and Survival of Juvenile Chinook Salmon in the Lookout Point Project, 2023-2025 (Presentation at Willamette Fisheries Science Review) |
| 7 | | RST-based project passage efficiency estimates for juvenile Chinook salmon respond positively to changes in dam operations (Presentation at Willamette Fisheries Science Review) |
| 8 | | USACE Willamette Valley System Dam Operations 2025 Year In Review (Presentation at Willamette Fisheries Science Review) |
| 9 | | U.S. Army Corps Willamette Basin Bi-Annual Status Report February 28, 2025 |
| 10 | 314 | Federal Defendants' Motion to Amend the Green Peter Implementation Plan |
| 11 | 320 | September 24, 2024 Order Approving Green Peter Plan Amendment |
| 12 | 317 | Defendant-Intervenors City of Albany's and City of Sweet Home's Response to Federal Defendants' Motion to Amend the Green Peter Implementation Plan |
| 13 | | Deep Drawdown Emergency Response Communications Plan Green Peter and Lookout Point Reservoirs Willamette Valley System, Oregon October 15, 2024 |
| 14 | | Emails between Conservation Groups' counsel Lauren M. Rule and U.S. Army Corps' counsel Michelle M. Spatz during litigation of *NEDC v. U.S. Army Corps*, No. 3:18-cv-00437-HZ |
| 15 | | 2023 Water Quality Report for Sweet Home Oregon |
| 16 | | 2024 Water Quality Report for Sweet Home Oregon |

## INTRODUCTION

Defendant-Intervenors Northwest Environmental Defense Center and Native Fish Society ("Conservation Groups") are filing this joint response to the Marion County, City of Salem, Santiam Water District, and City of Stayton (collectively "Plaintiffs") preliminary injunction motions, which seek to stop the deep drawdown of Detroit Reservoir planned for this November. This drawdown is an essential part of the long-term plan developed by the National Marine Fisheries Service ("NMFS") to ensure the survival and recovery of Upper Willamette River ("UWR") Chinook salmon and steelhead, which are protected under the Endangered Species Act ("ESA"). Plaintiffs have known for years this drawdown is coming, yet have refused to prepare for it. Drawdowns at other reservoirs in the Upper Willamette Basin have been occurring for years and improving survival of juvenile salmon trying to pass dams as they migrate downriver. Plaintiffs have known for several years that the U.S. Army Corps of Engineers ("Corps") is planning a similar drawdown at Detroit Dam to improve survival of North Santiam juvenile salmon and steelhead passing through that dam.

As far back as 2008, NMFS has been discussing reservoir drawdowns as important measures to improve survival of juvenile migrants in the Willamette Basin and directing the Corps to implement such measures. When the Corps failed to do so, Conservation Groups sued, alleging that the Corps' operations of the dams in the Willamette Valley System ("WVS") were violating the ESA by jeopardizing the survival and recovery of UWR Chinook salmon and steelhead and causing "take" of those fish, due in large part to the lack of fish passage at the dams. This Court agreed, and issued an injunction in 2021 ordering changes to operations to benefit the two fish species. Included within that injunction were deep drawdowns of Cougar, Green Peter, and Lookout Point reservoirs. In 2024, NMFS issued a new biological opinion covering operations of the WVS for thirty years that continued most of the injunction actions and

added a deep drawdown at Detroit Dam in its plan for ensuring against jeopardy and minimizing take of UWR Chinook and steelhead. As explained in the prior litigation and by Conservation Groups' expert, a fall drawdown of reservoirs is important to assist juvenile Chinook and steelhead migrating downriver through dams in the fall. These migrants exhibit different life history characteristics than spring migrants that can pass the dams via spill, and it is critical to maintain diverse life histories for recovery of these species.

The Detroit drawdown is much less extreme than the Green Peter and Lookout Point drawdowns, and the Corps has incorporated mitigation measures to minimize the threat of high turbidity based on its experiences with those other drawdowns. Plaintiffs' last-minute attempt to stop the drawdown from happening this fall must fail because they are unlikely to succeed on the merits of their legal claims and have provided no evidence that the drawdown this fall—with its limited elevation drop and a mitigation plan to address drinking water issues—is *likely* to cause imminent *irreparable* harm to Plaintiffs or that the balance of hardships tips *against* ESA-listed species. Indeed, Plaintiffs' allegations of harm involve economic impacts related to maintenance of drinking water infrastructure, tourism and recreation, and agricultural interests that do not outweigh impacts to ESA-listed fish. *See Yurok Tribe v. U.S. Bureau of Reclamation*, 179 F.4th 663, 674 (9th Cir. 2026) ("Congress in 1973 passed the ESA as we know it today with its broad and clear purpose of ensuring the conservation of endangered and threatened species, regardless of the cost.").

## FACTUAL BACKGROUND

### I. UWR CHINOOK SALMON AND STEELHEAD—STATUS AND THREATS.

Plaintiffs in this lawsuit gloss over the fact that the action they challenge was put in place because it is a critical piece of the plan to achieve survival and recovery of UWR Chinook

salmon and steelhead, including the North Santiam populations. These species have been listed as threatened under the ESA since 1999 and still remain well below recovery levels. 2024 NMFS Status Review (Exhibit 1) at 4, 18–20, 55–57; 2024 NMFS biological opinion ("BiOp") (Exhibit 2) at 4.6-256 to 259. Both species have declined further in the past decade, and lack of access to high quality spawning habitat above the WVS dams is a major factor. 2024 Status Review at 18–20, 22, 24; 2024 BiOp at 3.1-99, 3.2-117. The North Santiam populations of Chinook salmon and steelhead are both at risk of extinction and on a declining trend. Declaration of Kirk Schroeder ¶¶ 8–10 (filed herewith); *see also Willamette Riverkeeper v. NMFS*, No. 6:21-cv-00034-AA, 2026 WL 2690278, at *4–6 (D. Or. Sept. 14, 2026) (discussing North Santiam steelhead population).

The WVS dams, including Detroit Dam on the North Santiam River, completely block fish passage, and much of the historic spawning habitat for each species occurs above the dams. 2024 Status Review at 22; 2024 BiOp at 3.1-99, 3.2-117, 5.6-415. In the 2024 status review for both species, NMFS expressed "an increased level of concern in the risk status for UWR Chinook salmon and UWR steelhead. The basis for this concern includes: (1) Declining population trends . . . ; (2) Limited accessibility to historical spawning habitat . . . ." 2024 Status Review at 57. The one UWR Chinook population that has an upward trend is the Clackamas River population due to recent downstream fish passage improvements at the dams on that river. 2024 BiOp at 3.1-97 to 99, 5.1-309 to 310.

To mitigate for the lack of passage at WVS dams, adult fish are transported by truck above the dams and their reservoirs and released into upriver spawning habitat. *See e.g.,* 2024 BiOp at 5.6-417 (discussing adult Chinook collection and outplanting above Detroit Dam). Juveniles that are produced from these outplanted fish then must migrate downriver through the reservoirs and dams to go out to the ocean, and survival through the reservoirs and dams is low.

*Id.* at 5.6-417, 5.6-423 to 424 (noting that at Detroit Dam, downstream passage routes cause high mortality and injury rates and have low passage efficiency).

The reservoirs behind these tall "high-head" dams are very large and act like lakes, with little to no downriver flow when they are full. Juvenile fish navigate based on water flow, and in stagnant water cannot detect the direction that is downriver. *Id.* at 5.6-424 (juvenile Chinook unable to navigate the reservoir when it is refilling). When they remain in reservoirs for a long time, many perish from predation by predatory fish or from diseases or parasites that are prevalent in the reservoirs. *Id.* at 5.6-424 to 425. If they do finally reach the face of the dam, they must find a way through. The possible routes are over the spillway if the reservoir is full and water can spill over the top of the dam; through the power turbines, which are generally near the middle of the dam face; or through regulating outlets ("ROs") that are lower on the dam face. *See id.* at 5.6-422 to 423 (describing passage routes at Detroit Dam). Because juvenile fish are usually found within 25–50 feet of the water surface, they are unlikely to find an outlet in the dam if it is more than 50 feet below the reservoir surface. 2024 BiOp at 5.6-423 (juveniles will not find regulating outlet in Detroit Dam because it is 100 feet below the reservoir surface).

Outplanting of adult fish above reservoirs has had some success at producing juvenile fish in that high quality habitat, but downstream migration of juveniles has had poor success due to the high rates of mortality and injury during reservoir and dam passage. For instance, NMFS discussed in the 2024 biological opinion the low survival of juvenile salmon trying to pass through Detroit Dam, with studies showing just 50% of juvenile Chinook surviving spring passage and only 20% surviving fall passage. 2024 BiOp at 5.6-422 to 432. "The lack of safe downstream passage for juveniles at high-head dams continues to be a primary factor limiting recovery for both species." 2024 Status Review at 30. One of the key actions to advance the

recovery of UWR Chinook and steelhead is to "provide effective passage and revise reservoir operations to promote access to historical spawning and rearing areas currently blocked by high-head dams" for the North Santiam and other populations. 2024 Status Review at 26, 30, 61; *see also* 2024 BiOp at 5.1-309 (recovery parameters "are expected to improve when safe downstream passage is provided").

This Court previously recognized the many adverse effects of the WVS to UWR Chinook salmon and steelhead, particularly the lack of access to historic spawning habitat and poor success of juvenile downriver migration through reservoirs and dams. *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 479 F.Supp.3d 1003, 1009 (D. Or. 2020) ("*NEDC I"*). By failing to complete actions that NMFS had determined in a 2008 biological opinion were necessary for the survival and recovery of both species, and allowing operations that injured and killed fish at high levels to continue, the Corps was violating the ESA by jeopardizing the species' continued existence and causing unlawful "take." *Id.* at 1013–18, 1021–23, 1027.

In that ruling on the merits, Judge Hernández made several critical findings that are relevant here. He found that the Corps "failed to carry out several of the most important . . . measures" from NMFS's Reasonable and Prudent Alternative ("RPA") in its 2008 biological opinion, including timely downstream fish passage; and NMFS had determined that lack of passage is "one of the single most significant adverse effects on both fish and their habitat." *Id*. at 1012, 1014. As a result, "[f]ar short of moving towards recovery, the Corps is pushing the UWR Chinook and steelhead even closer to the brink of extinction." *Id*. at 1017. "[T]he Corps' operation of the [WVS] without completing the RPA measures is causing the species' decline," and thus jeopardizing the species' existence. *Id*. at 1018. Furthermore, the Corps' discretionary operations of the dams resulted in unlawful "take" of these fish by, *inter alia*, causing 71%

mortality of juvenile salmon that passed through Detroit and Big Cliff dams on the North Santiam River, exceeding the level of take authorized under the 2008 biological opinion. *Id*. at 1022–23.

As a remedy, Judge Hernández issued an injunction that required the Corps to implement a large suite of operational, structural, and other measures to improve fish passage and water quality until NMFS issued a new biological opinion because "[i]t is abundantly clear that changes to the Corps' operation of the [WVS] are necessary to avoid irreparable harm." *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs,* 558 F.Supp.3d 1056, 1075–79 (D. Or. 2021) ("*NEDC II*"). In particular, the Corps' "failure to provide adequate fish passage" was causing "substantial, irreparable harm" that was evident from the species' "continuing decline." *Id*. at 1064. For a remedy, the Corps had proposed certain operational changes, but Judge Hernández found those changes did not "adequately address the lack of volitional fish passage," which is "biologically necessary." *Id.* "Spill operations and deep drawdown measures represent the most effective means for providing safe fish passage under current dam configurations." *Id*. One of the injunction measures was the use of deep reservoir drawdowns to facilitate downstream migration of juveniles, as discussed below.

The Court's injunction ordered the Corps to carry out certain interim measures, and ordered additional measures to be developed by an expert panel (that included Conservation Groups' expert Kirk Schroeder), which would "hammer out the details and propose implementation plans" for more complicated measures. *Id*. at 1076. The injunction required completion of ESA consultation with NMFS by December 31, 2024; implementation of interim measures "to the greatest extent practicable under existing hydrologic conditions and necessary flood control operations" with "every effort to comply with the various water quality standards;"

and bi-annual status reports to report on implementation and monitoring of the injunction actions. *Id*. at 1076–1079.

## II. USE OF DRAWDOWNS TO IMPROVE SURVIVAL AND RECOVERY.

As Judge Hernández noted, "[t]he biological justification for [deep drawdowns] is relatively straightforward." *Id*. at 1064. He explained them as follows:

> Juvenile salmonids must pass through the dams to successfully outmigrate to the marine environment. The salmonids typically navigate downstream by following the flow of the river; however, the large, slow-moving reservoirs behind the dams disrupt these natural outmigration cues, making it difficult for the fish to find their way downstream to the dam and lengthening their exposure to predators and pathogens in the reservoirs. Increasing flow via drawdowns and spill operations reduces the size of the reservoir and accelerates the salmonids' navigation to the dam, thereby decreasing their exposure to pathogens and predators. But once the juvenile salmonids reach the dams, they can only pass downstream through the hydropower turbines, regulating outlets ("ROs"), or spillways. For likely obvious reasons, significantly higher fish mortality occurs when the juvenile salmonids pass through the turbines instead of the ROs or spillways, making non-turbine fish passage the safest available option. And, concerning drawdowns specifically, juvenile salmonids are surface-oriented fish, meaning they cannot sound very deep and are unlikely to find the ROs unless the reservoir surface elevation is drawn down within 20 to 25 feet of the outlet opening.

*Id.* at 1064–65 (citing Conservation Groups' experts—including Mr. Schroeder—and exhibits).

NMFS began recommending deep drawdown operations to the Corps in its 2008 biological opinion, but the Corps only implemented it at one dam—Fall Creek—beginning in 2011. *NEDC II* at 1060–61; 2024 BiOp at 2.3-53 (discussing Fall Creek drawdown). Further deep drawdowns did not occur until they were implemented to fulfill this Court's injunction order, with fall deep drawdowns then occurring at Cougar Dam (beginning in 2021), Green Peter Dam (beginning in 2023), and Lookout Point Dam (beginning in 2023). *NEDC II*, 558 F.Supp.3d at 1076–79 (injunction order), 1086–97 (Cougar Implementation Plan); Green Peter Implementation Plan (Exhibit 3); Lookout Point Implementation Plan (Exhibit 4). NMFS's 2024 biological opinion carried forward the deep drawdowns at Cougar, Green Peter, and Lookout

Point dams, and added one at Detroit Dam as well. 2024 BiOp at 5.2-347 (Lookout Point), 5.3-363 (Cougar), 5.5-395 (Green Peter), 6.4-524 (Detroit).[1]

An important aspect of the fall deep drawdowns is that it allows for migration of juveniles that arrive at the reservoir in the fall, which are different life history forms than juveniles that migrate in spring and can pass the dam via spill. 2024 BiOp at 3.1-96. Life history diversity within the species and within populations strengthens their resilience to changes in environmental conditions, including climate change, and provides stability and resilience to populations. *Id.* Based on his own extensive research, Conservation Groups' expert explains the importance of life history diversity and the diversity within UWR Chinook salmon and steelhead, including the North Santiam populations. Schroeder Decl. ¶¶ 11–24 & Exs. A, B. Different migratory and rearing behaviors exhibited by fish that were born in the same year is known as life history diversity, with some juveniles remaining longer near their spawning grounds before migrating and others moving downriver to different rearing areas sooner. *Id.* ¶¶ 11–12. This behavior limits the exposure of the entire population to natural or human-caused events that may have localized effects, and provides stability to the population. *Id.* ¶¶ 12, 15, 17.

Juvenile UWR Chinook have a broad range of migratory life histories that migrate at different ages and at different times of year, and fall migrants are an important life history within the species. Schroeder Decl. ¶ 18. Juveniles that rear near their spawning ground before

---

[1] Conservation Groups did not seek a deep drawdown at Detroit as part of the remedy in *NEDC II* because of opposition from the City of Salem, which was a Defendant-Intervenor in the case. To avoid that controversy, Conservation Groups went along with the Corps' proposal to try use of the regulating outlets in the fall to pass fish even though it was unlikely to succeed due to the reservoir being almost 100 feet above the elevation of the outlet. Indeed, that operation was not successful at passing fish, thus necessitating a deeper drawdown of the reservoir to use the regulating outlet for fish passage. *Cf.,* Marion County Opposition to Motion to Intervene (ECF No. 35) at 4–5 (incorrectly stating facts about prior injunction requests and orders in *NEDC II*).

migrating have a yearling life history (*i.e.*, they migrate to the ocean in their second year), and many of those fish would naturally move downriver from spawning areas to the lower river in the fall and early winter. *Id.* ("juvenile salmon migrating to downstream areas in fall and early winter make an important contribution to the total number of yearling smolts"). Spawning areas above the dams are better habitat and have colder water than below the dams, making the yearling life history important, especially as climate change continues to degrade downriver habitat. *Id.* ¶¶ 18–20. Thus, "[i]ncreasing the number of fall migrants (and in turn yearling smolts), which generally rear in upper watershed areas where habitat conditions are more favorable, is important to strengthening survival and recovery of the species." *Id.* ¶ 19.

Providing dam passage for fall migrants is key to increasing the yearling life history in populations, which "will allow expression of the inherent life history diversity in Chinook salmon that is critical for the resilience and stability of a population and its recovery." Schroeder Decl. ¶¶ 22–24; *see also* 2024 BiOp at 5.6-426 *(*without fall migration at the dams on these rivers, "the diverse life-history of early and later migration is disrupted"). Increasing the yearling life history in the North Santiam population requires improved passage for fall migrants. Schroeder Decl. ¶¶ 19, 22–24.

Because of the importance of fall migration, fall drawdowns at several WVS dams have been occurring already, as noted above. The Cougar deep drawdown drops the reservoir 27 feet below normal minimum conservation pool. *NEDC II*, 558 F.Supp.3d at 1087. In contrast, the Green Peter and Lookout Point drawdowns were much deeper, with Green Peter reservoir dropping 142 feet and Lookout Point reservoir dropping 75 feet below their respective minimum conservation pool elevations. Exs. 3 & 4 (Implementation Plans for Green Peter and Lookout Point drawdown operations); 2024 BiOp at 2.1-18 (table with reservoir and outlet elevations for

WVS dams). Minimum conservation pool (also called minimum flood control pool) is the lowest elevation the reservoir generally reaches each year, and occurs in late fall through mid-winter to capture heavy rain events and prevent downstream flooding. 2024 BiOp at 2.3-35 to 36. A deeper drawdown drops the reservoir below that level in the late fall in order for the surface to be closer to the regulating outlets so fish can find that outlet. Schroeder Decl. ¶ 29.

Early results from the drawdowns suggest they are improving passage of juvenile Chinook salmon. Research at Lookout Point from 2023–2025 found that, "[s]urvival increases with decreasing reservoir elevation and increasing [regulating outlet] flow" with peak passage occurring in November and December when the reservoir was at the low point of the drawdown. Ex. 5 at 4–7; Ex. 6 (Kock *et al.*). Likewise, another study of Cougar and Lookout Point drawdowns found that the drawdowns "are leading to measurable and significant improvements in overall project survival," and that higher passage efficiency "was associated with lower reservoir elevations (*i.e.*, a shorter depth to the outlet) and higher total outflows. This indicates that operational strategies incorporating these conditions are most beneficial for improving downstream passage." Ex. 5 at 19; *see also* Ex. 7 (McAllister *et al.*). Mr. Schroeder also discusses results showing the deep drawdowns at Green Peter, Cougar, and Fall Creek dams have been effective at passing and improving survival of juvenile fish. Schroeder Decl. ¶¶ 25–27.[2]

Although the drawdowns have been occurring for only a few years, the Corps has already made adjustments to the operations at Green Peter, Lookout Point, and Cougar to address

[2] Marion County claims that the Green Peter drawdowns do not work because the % of wild Chinook returning to the South Santiam has declined since the drawdowns began in 2023. *See* Amerman Decl. ¶ 12 (ECF No. 20). This statement is inaccurate because about 90% of the returning adults in 2026 would be 4–5 years old, and would have been migrating downriver in 2021 or 2022—before the drawdown. Schroeder Decl. ¶ 39. Moreover, monitoring results show that dam passage efficiency and survival were high during the Green Peter drawdown. *Id.* ¶ 25.

turbidity and water temperature issues through the adaptive management process based on monitoring results and input of experts. Ex. 8 (Buccola *et al*.). At Lookout Point, water temperatures improved and turbidity declined significantly between 2023 and 2025. *Id.* at 9–12. In 2024, the downstream city of Lowell, which gets its drinking water from Dexter Reservoir just below Lookout Point Dam, "reported very few issues with the drawdown operations and associated turbidity." Ex. 9 at 81 (Corps' February 2025 status report on implementation of the injunction measures).

Green Peter operations were also adjusted between 2023 and 2025 to address water temperature concerns and high turbidity. Ex. 8 at 5–8. Some improvement occurred in 2024, and even cooler water temperatures and lower turbidity occurred in 2025. *Id.; see also* Schroeder Decl. ¶ 35 (noting mean turbidity level decreased 30% from 2023 to 2024 and duration of turbidity was 53% lower in 2024). Notably, after the 2023 Green Peter drawdown strained drinking water systems of Sweet Home and Albany due to high turbidity, the Corps made two modifications for the 2024 drawdown: (1) it delayed the drawdown until later in the fall and lowered the reservoir faster than in 2023; and (2) it worked with the State and cities to create an emergency response and communication plan. Ex. 10 (motion in *NEDC II* to modify Green Peter deep drawdown operation); Ex. 11 (revised implementation plan). Despite objections by the cities of Sweet Home and Albany that the revised plan was not sufficient, Judge Hernández approved the modification. Ex. 12; Ex. 11 at 1.

The revised implementation plan explained that high turbidity in 2023 was caused by "the upper reservoir uncovering the riverbed and cutting a new channel through the sediment that had accumulated in the bottom of the reservoir over decades." Ex. 11 at 3. Water temperatures below the dams were high in October, which is detrimental to egg incubation. *Id.* at 5. To address

these problems, the Corps consulted with various federal and state agencies and the cities, and analyzed data from the 2023 drawdown, which led to modifications for the 2024 drawdown. *Id.* at 7–8. The Corps modified the operation such that the drawdown would start about a month later, around mid-October, and would drop the reservoir at a faster rate to reach the target 30-45 days later. *Id.* at 8, 10. The modified plan also included language: "The injunction operation will be paused or terminated if downstream drinking water facilities are unable to meet water supply demands or if a public health emergency is declared (*e.g*., city issues boil water notifications, do not use declaration, or water restrictions)." *Id.* at 10.

After the court approved this modification, the Corps developed a "Deep Drawdown Emergency Response and Communication Plan" for the Green Peter and Lookout Point 2024 drawdowns. Ex. 13. The plan identified criteria and procedures for notifying the Corps about drinking water facility concerns and requests to halt the drawdown, and stated that the Corps would host regular meetings with State and city officials during the drawdown. *Id.* at 2–4. On November 22, 2024, twelve days after reaching the target elevation, the Corps halted the drawdown to protect downstream public water systems and began refilling the reservoir. Ex. 14 (notifying Conservation Groups' counsel of the halt to the drawdown).

Even with the turbidity issues in 2023 and 2024, the city of Sweet Home's drinking water system was able to stay within drinking water standards both years. Ex. 15 (Sweet Home 2023 water quality report); Ex. 16 (Sweet Home 2024 water quality report); Ex. 12 at 4 (city's statement that it produced drinking water and stayed within regulatory requirements in 2023 even though it received complaints about odor, color, taste). In 2025, the drawdown was delayed further and was a bit more gradual than 2024, and remained at the target level for 15 days. Ex. 8 at 5. This operation produced little turbidity and cooler water temperatures. Ex. 8 at 6-8; *see also*

Declaration of Jennifer Fairbrother ¶ 17 (ECF No. 14) (describing Green Peter drawdowns in 2024 and 2025).

## III. THE NEED FOR THE DEEP DRAWDOWN OF DETROIT RESERVOIR.

In the North Santiam, currently only adult Chinook are outplanted above Detroit Dam, largely because of the small number of UWR steelhead returning to the North Santiam basin and the lack of safe downstream fish passage at the dam. 2024 BiOp at 4.6-260, 5.6-418. For juvenile Chinook born above the dam, "[t]he current lack of downstream passage provisions at the North Santiam dams results in migration delays and direct mortality of juvenile Chinook salmon." 2024 BiOp at 4.6-261. Downstream passage occurs via spill when the reservoir is over 1541 feet elevation, or through the turbines. 2024 BiOp at 5.6-423. Use of the upper regulating outlets in Detroit Dam to try and pass fish at night has not been successful because the reservoir elevation is more than 100 feet above the regulating outlet, and "UWR Chinook salmon are not expected to sound to that depth," thus "there is scant evidence of UWR Chinook salmon moving downstream through this route . . . ." *Id.; see also* ROD at 10 (noting that use of regulating outlet at night when reservoir is at 1450 feet will not continue due to wear and tear on the outlet and because "fish have better passage survival outcomes when the reservoir elevation gets closer to a given outlet. The drawdown to 1395 feet will improve passage survival rates through the regulating outlet while reducing the wear on the outlet itself.").

Monitoring from 2024 showed that only 2.8% of juvenile Chinook that entered the reservoir migrated past the dam during spill operations that spring. 2024 BiOp at 5.6-424. Because turbine passage, which is the primary route for fall passage, has low survival, the current operational passage routes at Detroit Dam "have overall low efficiency, low survival, and do not provide safe passage" which "will further reduce productivity and abundance of UWR

Chinook salmon and UWR steelhead." 2024 BiOp at 5.6-432; *see also* Schroeder Decl. ¶ 30 (higher mortality passing through powerhouse than through RO). The Corps began proposing a deep drawdown at Detroit in its 2022 Draft Environmental Impact Statement ("DEIS"), with a target elevation of 1375 feet. DEIS at 2-24 to 2-27.[3] NMFS added the drawdown as part of the RPA in its 2024 biological opinion, explaining that the measure would "increase[] possibility for RO outlets to be accessible by lowering reservoir elevations," providing another option "for greater survival for juvenile migrants, allowing diverse migratory life history stages." 2024 BiOp at 6.4-524. As explained above, migration in fall is critical to preserve yearling life history forms within the North Santiam Chinook population.

Under the RPA Detroit deep drawdown operation, the reservoir would ultimately be no more than 50 feet above the upper regulating outlet so juvenile Chinook are more likely to find that safer passage route through Detroit Dam. *Id.* NMFS stated that without the fall deep drawdown of Detroit Reservoir, "UWR Chinook salmon will continue to experience current high passage mortality." 2024 BiOp at 5.1-309. NMFS specifically asserted its expert opinion that the RPA measures "will avoid jeopardizing the continued existence of UWR Chinook salmon and UWR steelhead," and the RPA "is intended to be *fully implemented* in order to avoid jeopardy." 2024 BiOp at 5.12-496 (emphasis added).

Critically, drawing down the Detroit Reservoir in the fall to this level is the *only* effective downstream passage measure available. Schroeder Decl. ¶ 31. The Corps and NMFS identified this as the only available operational measure, and Plaintiffs have identified no other options. While the biological opinion describes this as an "interim" operation, it is highly uncertain

---

[3] All of the Environmental Impact Statement and Record of Decision documents are found at: https://www.nwp.usace.army.mil/WVS-EIS/.

whether a "permanent" structural solution is technically possible or will be biologically effective. Indeed, the Corps has reinitiated ESA consultation with NMFS over long-term passage solutions due to concerns about cost and feasibility of passage structures. ROD at 2–3.

The 2026 Detroit deep drawdown will likely produce much less turbidity than the Green Peter or even Lookout Point drawdowns did in 2023 due to the small decrease in reservoir elevation and recent drawdowns to this same level. The final target elevation for the reservoir is 1395 feet (as opposed to the DEIS proposal of 1375 feet), and the Corps is going to achieve that target incrementally over three years, only lowering the reservoir 25 feet below the normal minimum conservation pool this fall (1450 feet to 1425 feet). Supplemental Environmental Impact Statement ("SEIS") at 19. In contrast, the Lookout Point drawdown is 75 feet below minimum conservation pool, and the Green Peter drawdown is *142 feet* below minimum conservation pool, creating much smaller residual reservoirs and much longer river channels cutting through the newly exposed reservoir beds compared to the Detroit drawdown. SEIS at 19, 217; Ex. 3 at 2–3, 11; Ex. 4 at 3–4. The Lookout Point and Green Peter reservoirs had not been that low since the dams were built in the 1950s and 1960s, resulting in decades of sediment accumulation at the bottom of those reservoirs. *See* Ex. 11 at 2. In contrast, the Detroit Reservoir dropped to 1425 feet in 2015 and 2019 for flow augmentation and maintenance requirements—the same elevation planned for 2026. SEIS at 19.

During the 2015 and 2019 drawdowns at Detroit Dam, turbidity below the dams remained relatively low. Schroeder Decl. ¶ 32. USGS turbidity data shows daily maximum turbidity in 2015 never went above 15 FNU and the daily median was <10 FNU. *Id.* In 2019, it was even lower, with <10 FNU for daily maximum and median. *Id.* The slight elevations in turbidity lasted only 6–10 days. *Id.* Indeed, "downstream users did not experience or report

concerning levels of turbidity" during those 2015 and 2019 drawdowns. ROD at 12. In comparison, other natural or human-caused events have generated much higher levels of turbidity in the North Santiam River a little above the City of Salem drinking water facility on Geren Island. *Id.* ¶ 33. Daily maximum turbidity exceeded 50 FNU on 26 occasions, and exceeded 330 FNU three times, since 2020. *Id.* Daily median levels exceeded 50 FNU five times, with levels over 140 FNU two times. *Id.* Much of the turbidity in this lower part of the river comes from the Little North Santiam River, which is about 19 miles downriver of Big Cliff Dam. *Id.* ¶¶ 33–34. This data indicates Salem and Stayton's drinking water facilities have experienced much more turbidity from rain events than will occur from the 2026 drawdown.

Furthermore, the Corps' Emergency Response and Communication Plan will be a safeguard if turbidity is higher than expected. SEIS at 218. This plan worked to halt the Green Peter drawdown in 2024 to protect drinking water systems of Sweet Home and Lebanon. Ex. 14. The Corps will be monitoring turbidity in real time at multiple locations and can react quickly to stop the drawdown if necessary to protect drinking water systems, as it did in 2024. SEIS at 218; ROD at 13. Accordingly, the Corps' plan for the Detroit drawdown has taken into account comments and concerns about turbidity and addressed them.

Plaintiffs here have known a deep drawdown at Detroit has been in the works for years, and discussed this action with the Corps two years ago. *See* DEIS at 2-24 to 2-27; Teed Decl. ¶ 9 & Ex. 6 (ECF No. 25) (Corps met with Marion County in October 2024 to discuss the drawdown). Yet they have waited until the eve of implementation to try and halt this important action, claiming an emergency due to their lack of preparation. As explained by Mr. Schroeder, effective downstream passage at Detroit Dam in the fall is critical for the survival and recovery of North Santiam Chinook salmon and steelhead, and a deep drawdown is the only available

means of providing safe and effective fall passage for these species. Schroeder Decl. ¶¶ 40–44. "[A]ny additional delay in implementing this measure will only increase the jeopardy to the listed salmon and steelhead populations." *Id.* ¶ 44.

**ARGUMENT**

Plaintiffs fail to recognize a key point: the Detroit deep drawdown is an ESA obligation with which the Corps must comply. It is not a question of *whether* the Corps will conduct the drawdown, it is simply a matter of when and how it will implement it. The Detroit deep drawdown is a key RPA measure from the 2024 biological opinion to ensure the survival and recovery of North Santiam Chinook salmon, and that population is important for survival and recovery of UWR Chinook as a whole. The drawdown is also a key element for staying within the "take" limits authorized in the incidental take statement of the 2024 biological opinion. The Corps does not have discretion to jeopardize the survival and recovery of a threatened species, or cause "take" of the species that exceeds the level authorized in an incidental take statement, which will occur if high mortality of juveniles passing through Detroit Dam under current operations continues. If the Corps fails to implement the Detroit deep drawdown, it will be doing exactly what this court found was unlawful in *NEDC I*—causing jeopardy and take by failing to implement a key RPA passage measure. *See NEDC I*, 479 F.Supp.3d at 1015 (rejecting the Corps' defense that compliance with *some* RPA measures was sufficient and holding that given "[t]he geographic and temporal complexity of the salmonids' various life stages . . .the RPA needed to be fully implemented to avoid jeopardy"). Plaintiffs completely ignore these ESA obligations.

In light of this obligation, the Corps' legal duty was to disclose the potential impacts of the drawdown, which it did in its Final Environmental Impact Statement ("FEIS") and SEIS, and to craft a plan that would minimize the likelihood of high turbidity levels that could harm

drinking water systems or violate water quality standards, which it also did. Plaintiffs have not shown that the fall 2026 drawdown is likely to cause them irreparable harm because they have no evidence the dire consequences they claim may happen are actually *likely* to happen; and their allegations amount to economic damage, which is not irreparable. Moreover, they completely ignore the principal that the balance of hardships weighs heavily in favor of threatened species over economic, recreation, and irrigation interests. For all of these reasons, the Court should deny the preliminary injunction motions.

## I. PLAINTIFFS' LEGAL CLAIMS HAVE NO MERIT.[4]

### A. Plaintiffs' Challenges to the SEIS and ROD Are Unlikely to Succeed.

#### 1. Turbidity

The main thrust of the challenges to the SEIS are that the Corps did not adequately assess turbidity impacts from the Detroit Reservoir deep drawdown. The SEIS discussed those impacts, and the Corps made adjustments to the operation based on comments received from Plaintiffs and others. Plaintiffs largely base their contentions about the Detroit drawdown on the experience of the Green Peter drawdown, but as the SEIS explained, the Detroit drawdown is very different from the Green Peter drawdown and will produce less sediment. The SEIS also discussed the Corps' monitoring and emergency action plan to address concerns about drinking water. While Plaintiffs may have preferred that the SEIS use a different methodology and do not like the Corps' substantive decision, they have not shown the Corps' analysis violated NEPA.

The Corps' obligation under NEPA is to take a "hard look" at potential impacts of its proposed action and disclose those impacts to the public. *Seven Cnty. Infrastructure Coal. v.*

---

[4] Conservation Groups do not address every legal argument raised Plaintiffs and rely on the Federal Defendants' response for the issues they do not address.

*Eagle Cty.*, 605 U.S. 168, 180 (2025) (NEPA requires an agency "to prepare an adequate report…[and]…no more."). This procedural obligation does not dictate what action the Corps must, or must not, take. *Id*. (explaining that NEPA is a "*purely procedural statute*" that "imposes no *substantive* constraints on the agency's ultimate decision"). In contrast, the ESA imposes substantive requirements on agencies that do dictate what actions an agency must, or must not, take. 16 U.S.C. § 1536(a)(2) (agency must not jeopardize threatened or endangered species); *id*. § 1538(a)(1) (no person may "take" protected species); *see also* Record of Decision ("ROD") at 5 ("The Corps must operate and maintain the WVS for specific purposes but cannot jeopardize the continued existence of a species listed as threatened or endangered . . . ."). Here, the Corps is meeting obligations of both statutes by conducting the Detroit deep drawdown required for ESA compliance, and disclosing the impacts of the drawdown to the public as required by NEPA.

The Corps' analysis of the Detroit drawdown became increasingly detailed during its NEPA process. The original FEIS acknowledged that deep drawdowns could cause an increase in turbidity in drinking water sources, resulting in temporary treatment costs of additional chemicals, testing, facility maintenance, repairs, equipment replacement, and administrative costs. FEIS Chpt. 3.11 at 42. It could also result in temporary loss of drinking water access and the requirement to supplement potable water. *Id.* The FEIS stated that the Corps is not responsible for providing drinking water, and that "[d]rinking water quality is the responsibility of municipalities that own and operate public water systems." *Id.*

The draft SEIS ("DSEIS") provided detail about the Detroit deep drawdown in particular and compared it to the Green Peter and Lookout Point drawdowns from 2023 and 2024. DSEIS at 210–211. It described the decrease in turbidity from 2023 to 2024 at Lookout Point and Green Peter, but acknowledged that the 2024 drawdown at Green Peter still had some impact on

downstream drinking water facilities. *Id.* at 210. The Corps expected the Detroit drawdown to mobilize sediment, "but to a lesser extent than at Green Peter." *Id.* Not only will the Detroit drawdown "expose a significantly smaller area of sediment and retain a larger residual pool relative to the Green Peter drawdown operation (Figure 3-32), estimated to result in less turbidity in the North Santiam River," lowering the reservoir in a stepwise approach to reach the target elevation over the course of several years would "minimize[e] how much new sediment is exposed each year." *Id.* The larger residual pool at Detroit would trap more sediment than the Green Peter residual pool, although some fine clay material would likely stay in suspension and pass below the dam. *Id.* at 210–211. Appendix C of the draft SEIS explained sediment transport in detail, and used residual pool size to assess how much sediment would be transported downriver because there was a lack of data to quantitatively estimate that metric. DSEIS App. C.

The DSEIS recognized that increased turbidity from the Detroit drawdown could result in adverse effects to drinking water facilities that use water from the lower North Santiam River, including increased maintenance of filters and increased staffing of the drinking water facilities. *Id.* at 211. But the Corps would implement the Deep Drawdown Emergency Response and Communications Plan to "ensure strong communications with the State and cities of Salem, Stayton, and Gates's drinking water facilities during the drawdown of Detroit Reservoir to minimize impacts." *Id.* The draft SEIS also noted that a "sediment transport modeling team will continue developing tools to inform adaptive management of future drawdown operations." *Id.*

In response to comments, the final SEIS added further detail about the Detroit deep drawdown and compared it to the Green Peter drawdowns. It explained the Corps would initiate the drawdown in late November or early December, lower the reservoir over two weeks, and hold it at the target elevation for approximately two weeks. SEIS at 19. In the first year, the

reservoir would drop 25 feet[5] to a target of 1425 feet, "an elevation previously reached for low flow augmentation (2015) and spillway gate maintenance (2019)." *Id.* Based on turbidity levels, the Corps would lower the reservoir deeper each year until reaching 1395 feet. *Id.* This approach incorporated lessons from Green Peter, where the reservoir dropped 142 feet in one month. *Id.*

The turbidity analysis in the final SEIS discussed the Green Peter and Lookout Point drawdowns in 2023 and 2024, noting that the 2023 Green Peter drawdown resulted in unplanned maintenance and repairs to equipment and additional staffing for drinking water facilities. *Id.* at 216. Under the Emergency Response Plan, the Corps coordinated closely with facilities in 2024 and suspended the operation early. *Id.* Delaying the operation further into the fall in 2025 resulted in significantly reduced sediment mobilization and subsequent turbidity downstream during that operation. *Id.* Critically, despite these impacts, there were no reports that drinking water was unavailable or violated safe drinking water standards during these drawdowns. The SEIS again stated the much larger residual pool and incremental lowering over several years for the Detroit drawdown would result in less turbidity than the Green Peter drawdown. *Id.* at 217.

Contrary to Plaintiffs' assertion, the SEIS added substantial detail about impacts to the Salem's and Stayton's drinking water systems. *Id.* at 218. It acknowledged the Cities' comments that moderate levels of turbidity will threaten operation of their slow sand filtration systems, which are more sensitive to fine sediment than the drinking water systems on the South Santiam; high levels of turbidity would limit operations and potentially cause the systems to go offline; and fine clay particles could get through the filter systems into drinking water. *Id.* The SEIS also discussed the potential need for replacing the sand in the filter system due to high turbidity, the

---

[5] This page of the SEIS states the reservoir would drop 30 feet, but minimum conservation pool elevation is 1450' so lowering to 1425' is 25 feet.

lack of backup water for Stayton, and the potential impacts to Stayton's wastewater facilities. *Id.* The Corps would use real time monitoring and the Emergency Response and Communication Plan to ensure strong communications with facilities during the drawdown to minimize impacts, and a sediment modeling team would continue developing tools to inform adaptive management of future operations. *Id.; see e.g.,* Ex. 13 (Green Peter emergency plan).

The SEIS Response to Comments demonstrates the Corps considered the Cities' comments, added detail in the SEIS about potential impacts to drinking water systems, modified the operation to minimize turbidity, and committed to collect hydrology and turbidity data and use an Emergency Response and Communication Plan to modify, pause, or cease the operation to reduce adverse impacts. SEIS App. W 107–117, 125–152. With regard to turbidity levels, the Corps developed mitigation measures using data from other drawdowns and operations at Detroit Reservoir as well as modeling data. *Id.* at 112. However, "the exact amount of turbidity in any given year cannot be accurately predicted due to all of the natural and extraneous factors that go into managing a reservoir system and how real time operations are then used to reduce those impacts. Therefore, [the Corps] used high quality information and its professional judgment as well as comments to understand of [sic] the impacts to downstream users." *Id.*

The Corps also made clear in the SEIS Response to Comments that it must conduct this drawdown, stating that the "Detroit Reservoir drawdown is a legal requirement under the [ESA]." *Id.* at 130; *see also id.* at 128 ("The Biological Opinion requires the deeper drawdown of Detroit Reservoir every fall/winter until a different fish passage solution is in place."); *id.* at 150 (the drawdown "is a direct response to our legal obligations under the [ESA]").

The Corps satisfied its duty to take a hard look at impacts of the Detroit drawdown on turbidity levels and drinking water systems and disclose those impacts in its EISs. It used

existing data and models in its scientific analysis and described how it will continue to adjust operations through its adaptive management process as it collects more data and develops new models. NEPA requires nothing more. *See Concerned Citizens on I-190 v. Sec'y of Transp.*, 641 F.2d 1, 3 (1st Cir. 1981) (finding an EIS adequately discussed "the potential danger to the metropolitan Boston water supply" from increased turbidity due to highway construction where the EIS "explicitly addressed . . . the source and magnitude of the danger" along with "possible mitigation measures"). At bottom, Plaintiffs' complaint is a substantive and "scientific disagreement" and not "a failure of [the Corps] to consider and address the issue." *Gov't of Province of Manitoba v. Zinke*, 273 F.Supp.3d 145, 154 (D.D.C. 2017) (upholding an SEIS's analysis of increased turbidity from a water transfer despite "legitimate fears" about impacts).

**2. Reservoir Refill and Other Effects**

Plaintiffs argue the Corps did not consider other impacts of the drawdown, including the Corps' ability to refill the reservoir. This contention is also false. With regard to reservoir refill, the Corps described the impact of the Detroit drawdown on water supply, and explained that either with or without the drawdown, the reservoir might not be able to refill to full pool in a very dry year. Again, this evaluation and disclosure is all that NEPA requires. *See Concerned Citizens on I-190*, 641 F.2d at 3 (EIS's disclosure of danger to water supply was sufficient).

The SEIS discussed reservoir refill at Detroit and showed results of modeling for various water years. SEIS at ES-9, 50–51, 219, App. J at J-6 & J-83 to 84. In most years, the reservoir would refill to normal levels but in very dry winters, the Corps may not be able to refill Detroit Reservoir to minimum conservation pool by February 1, which could result in a lower reservoir level than currently experienced in very dry years. SEIS at ES-9, 219. In very dry years, there would likely not be enough water to meet consumptive demands from stored water. SEIS at 219.

The Corps would coordinate with regional partners to minimize impacts to downstream users reliant on streamflows but there would likely be some adverse effect. SEIS at ES-9, 219.

Plaintiffs also contend the Corps did not consider effects of the drawdown on resident fish, landslide risk, and mercury but the FEIS and/or SEIS discussed each of these. The Corps admitted that the drawdown would adversely affect resident fish in Detroit Reservoir and below Detroit Dam and thus affect fishing opportunities, although to a lesser extent than what occurred with the Green Peter drawdown because of the substantial difference in scale of the drawdowns. SEIS at 137-38, 184, 209, App. W at 58, 65, 77, 157, 158, 188. Protection of ESA-listed salmon is higher priority than protecting non-listed fish whose main purpose is recreational fishing, as Judge Aiken just ruled. *See Willamette Riverkeeper,* 2026 WL 2690278, at *14–15 (enjoining release of non-listed summer steelhead used for recreational fishing into the North Santiam River because of adverse impacts to North Santiam population of UWR winter steelhead).

For landslides, the Corps recognized that the drawdown could increase the risk of slope-slides around the reservoir, but too many variables affect whether a landslide might occur to quantify that risk. SEIS at 80. Neither the Corps nor Plaintiffs identified any landslides that occurred when Detroit Reservoir was recently drawn down to 1425 feet. Finally, the Corps also noted the chance that a drawdown could affect mercury levels in the water, although the risk is low and highly uncertain. FEIS at 74–76, 88, 130; SEIS at 92, App. W at 185.

By evaluating and disclosing these effects, the Corps fulfilled its NEPA duties. *See Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016) ("When the agency's determination is founded on reasonable inferences from scientific data, a reviewing court will not 'substitute its judgment for that of the agency.'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. 29, 43 (1983)). Plaintiffs may not like the result of the analysis,

and would prefer more certainty about the level of risk, but risks are often uncertain and unquantifiable. The Corps revealed the risks and used the methods it determined were feasible given existing data, which satisfied NEPA. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109–10 (9th Cir. 2016) (upholding an SEIS's risk modeling that lacked an estimate of the likelihood of certain problems given that there was "so much uncertainty" about the issue).

**3. Alternatives**

Finally, Salem and Marion County argue that the Corps should have considered other alternatives to the deep drawdown in the SEIS. The City and County misconstrue the relation of the interim operational measures with the alternative actions analyzed in the SEIS. The alternatives are different long-term strategies for operating the WVS to meet certain objectives. SEIS at 15–16; ROD at 5–6. The interim operations are a suite of independent actions that would be implemented until the long-term solution for downstream fish passage and water temperature management is in place and operational. SEIS at 19. Thus, the interim operations are in addition to, not part of, the action alternatives. SEIS at 216. The Corps included the interim operational measures it will conduct for the WVS, including the Detroit deep drawdown, in each of the alternative actions it analyzed because those interim measures are "required by the 2024 Biological Opinion RPAs." SEIS at 19; ROD at 9–10. Thus, the Corps could not consider an alternative to the Detroit deep drawdown included in the RPA. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir. 2004) (finding rejection of alternatives that would be "ineffective or even detrimental" to salmon was reasonable).

**B. Marion County's ESA-Related Claims Make No Sense.**

Marion County argues that the Detroit drawdown will violate the ESA because it will adversely affect UWR salmonids through changes to water quality and water flows. This

argument makes no sense because NMFS, the expert agency, included the Detroit drawdown in its 2024 biological opinion RPA measures that are required to "avoid jeopardizing the continued existence of UWR Chinook salmon and UWR steelhead," and the RPA "is intended to be *fully implemented* in order to avoid jeopardy." 2024 BiOp at 5.12-496 (emphasis added). The biological opinion and RPA included measures addressing water quality and water flows as well. As the expert agency responsible for protecting these threatened species, NMFS weighed the various impacts from WVS operations and determined which measures are needed to avoid jeopardy and minimize take. *See NEDC II*, 558 F.Supp.3d at 1075 (recognizing that "operational modifications [to the WVS] necessitate consideration of biological tradeoffs" by NMFS). Those measures included the Detroit deep drawdown. 2024 BiOp at 6.4-524.

The 2024 biological opinion also lays out a detailed process for adaptive management of operations through different teams of experts and decision makers. 2024 BiOp at 2.5-81 to 91, 6.3-505 to 506. Expert teams will assess data and use adaptive management to balance passage, water quality, and flow operations to be most beneficial to the fish. *Id.* at 6.4-518 to 524. Neither Marion County nor its declarants are experts on WVS operations and UWR Chinook salmon and steelhead biology. The expert agency has determined that the Detroit drawdown is necessary for survival and recovery of threatened species, and if the Corps does *not* implement that action, it would be in violation of the ESA. *See NEDC I*, 479 F.Supp.3d at 1015 (finding that "the RPA needed to be fully implemented to avoid jeopardy").

## II. PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM IS LIKELY.

To obtain a preliminary injunction, a plaintiff must establish that irreparable harm is "*likely*" not just possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The likely harm must be supported by a 'clear showing.'" *Giftango, LLC v. Rosenberg*, 925 F. Supp.

2d 1128, 1140 (D. Or. 2013) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Irreparable harm must also be "immediate, rather than remote or speculative." *Savage v. Elevenate, Inc*., No. 3:26-CV-00302-AB, 2026 WL 788937, at *3 (D. Or. Mar. 20, 2026). Here, Plaintiffs failed to make a clear showing that immediate irreparable harm to drinking water or other values is *likely*, rather than purely speculative.

### A. Plaintiffs Lack Evidence that Harm to Drinking Water is Likely.

Plaintiffs fail to show the Detroit drawdown planned for this fall is likely to harm drinking water for three key reasons.[6]

First, Plaintiffs have made "no showing of any real or immediate threat" of harm that would be caused by the 2026 drawdown. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Plaintiffs claim that excessive turbidity will impair drinking water systems, but they provide no evidence that excessive turbidity is likely to occur. The drawdown this fall will lower Detroit Reservoir just 25 feet below its normal level to an elevation of 1,425 feet, but drawdowns to that same level have occurred twice over the past decade and did not cause excessive turbidity or otherwise interfere with delivery of safe drinking water. *See* ROD at 12 ("downstream users did not experience or report concerning levels of turbidity" during the 2015 and 2019 drawdowns).

In fact, turbidity data from those years contradicts Plaintiffs' claim that turbidity will be extremely high this fall. During the 2015 drawdown, turbidity never exceeded 15 FNU, and during the 2019 drawdown, it never exceeded 10 FNU. Schroeder Decl. ¶ 32 & Figure 2. Marion County speculates that the drawdown this year is "riskier" due to timing differences, but provides absolutely no factual or expert support for that assertion. Mar. Cty. Br. 1 at 11. Allegations that

[6] The Court should consider only this fall's drawdown in its irreparable harm analysis because the merits of the case can be resolved before next year's drawdown, and further facts may develop over the next year that would be relevant to the 2027 drawdown.

"risk" may simply increase does not demonstrate that harm is *likely*. *See Cascadia Wildlands v. BLM*, No. 6:26-CV-00126-MTK, 2026 WL 2069994, at *10 (D. Or. July 17, 2026) (finding plaintiffs' "fear of increased fire risk" was too speculative to constitute irreparable harm).

Rather than consider data from the prior Detroit drawdowns, Plaintiffs base their fears about elevated turbidity levels on those that occurred during deep drawdowns at Green Peter and Lookout Point dams in 2023. Those drawdowns, however, are vastly different than the Detroit drawdown. As explained above, the Green Peter and Lookout Point drawdowns lowered the reservoirs 142 and 75 feet respectively, creating much smaller residual pools and exposing far more of the reservoir beds, where sediment had accumulated for many decades. *See supra,* p. 15. The following SEIS figure illustrates this extreme difference:




| Project | Area Exposed Sediment |
|---|---|
| Detroit | 0.8 mi² |
| Green Peter | 4.5 mi² |

| Project | Change in Sediment Transport Potential |
|---|---|
| Detroit | 44% |
| Green Peter | 314% |

**Figure 3-32. Green Peter (bottom) and Detroit (top) exposed areas between the normal minimum conservation pool and the deep drawdown elevations.**

See Appendix C for full understanding of this figure.

Furthermore, the level of turbidity from the Green Peter and Lookout Point drawdowns decreased in 2024 and again in 2025, *see supra* pp. 11–13, indicating that a third drawdown at Detroit would produce even lower levels of turbidity than in 2015 or 2019. By providing "no evidence" that drawing down Detroit reservoir to the same level that it reached in 2015 and 2019 is likely to cause "real and imminent" harm, Plaintiffs have failed to meet their burden that enjoining the drawdown in 2026 is warranted. *Giftango*, 925.F.Supp.2d at 1140.

Second, Plaintiffs lack factual evidence to demonstrate that drawing down Detroit Reservoir is "likely" to result in actual harm to drinking water. *See* Mar. Cty. Br. at 34–37 (Marion County's irreparable harm argument lacks factual evidence); City of Salem Br. at 24–28 (City of Salem includes just one factual citation in its five-page irreparable harm argument) (citing Pulley Decl. ¶¶ 21–22, Ex. F); City of Stayton Br. at 12–13 (City of Stayton citing only to declaration of former interim Public Works Director). Salem and Stayton water facility managers claim that the Detroit drawdown will imperil their drinking water by requiring accelerated cleaning or replacement of filters. Pulley Decl. ¶¶ 9, 22 & Ex. F at 4 (finding that filter run times may drop from three months to 2–3 weeks at high turbidity levels); Buchanan Decl. ¶¶ 8–11 (discussing cleaning and replacement of filters under high turbidity). But the cities fail to connect the dots to show that the Detroit drawdown this fall is *likely* to create turbidity levels so high that additional cleaning of filters cannot keep drinking water safe. Instead, the cities merely allege that if high turbidity occurs, it *could* lead to such problems, which falls short of a clear showing that harm is *likely*. Pulley Decl. ¶ 22; Buchanan Decl. ¶ 11; *see W. Virginia Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 117 (4th Cir. 2026) (finding a lack of irreparable harm where expert testified that consuming contaminated drinking water "made harm likelier, not more likely than not").

Moreover, the Cities' claims about inability to handle high turbidity are again undercut by USGS turbidity data. The monitoring station just 4.5 miles above the City's drinking water facility recorded turbidity exceeding 50 FNU on 26 occasions since September 2020, and exceeding 330 FNU on three occasions. Schroeder Decl. ¶ 33. Much of the sediment comes from the Little North Santiam River, which enters the North Santiam River 19 miles below Big Cliff Dam. *Id.* ¶¶ 33–34. Thus, the Cities' drinking water facilities must handle levels of turbidity much higher than what is expected from the Detroit drawdown on a fairly regular basis.

Third, Plaintiffs fail to demonstrate that *any* harm is likely given the Corps' imposition of mitigation measures and an emergency action plan to minimize turbidity and protect drinking water. As discussed above, the Corps has been implementing deep drawdowns at dams on the other major tributaries of the Willamette River for several years without causing any drinking water systems to violate safe drinking water standards. *See supra* pp. 7, 11–12. When potential problems arose in 2024 during the Green Peter drawdown, the Corps' emergency action plan stopped the drawdown and allowed delivery of safe drinking water to continue. Exs. 13 & 14. Should elevated turbidity become a problem during the Detroit drawdown, the Corps will employ its emergency action plan to do the same. SEIS at 218. Plaintiffs failed to address, let alone show, that this emergency plan will be ineffective at protecting drinking water, and thus failed to meet their burden to prove that harm is *likely*. *See Myers v. BLM*, No. 13-CV-00701-RM-BNB, 2015 WL 161179, at *6 (D. Colo. Jan. 13, 2015) (finding a lack of irreparable harm despite CWA violations where plaintiff failed to demonstrate "that future remedial efforts will not be successful in making the drinking water near [their] home safe for consumption").

In sum, Plaintiffs failed to make a "clear showing" that irreparable harm to drinking water is "likely" rather than merely speculative, which is fatal to their motion. *Giftango*, 925 F.

Supp. 2d at 1140. Accordingly, Plaintiffs' arguments that harm to drinking water will, in turn, harm essential services, core business operations, school learning, vulnerable populations, and their reputations are likewise unfounded.

**B. Other Types of Alleged Harms are Not Irreparable.**

Other alleged harms that Plaintiffs raise likewise do not establish likely irreparable harm to warrant an injunction.

First, Salem and Stayton indicate that additional resources will be needed to clean and replace filters if turbidity levels increase, which amount to economic impacts that are not irreparable. City of Salem Br. at 26–27; City of Stayton Br. at 13; *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991) (explaining that "economic injury alone does not support a finding of irreparable harm"); *Savage*, 2026 WL 788937, at *3 (D. Or. Mar. 20, 2026) (finding "economic harm" did not constitute irreparable harm). Relying on *National Association of Manufacturers v. U.S. Department of Homeland Security*, Salem tries to recast such monetary costs as operational disruptions but that case is far afield. City of Salem Br. at 26–27. In that case, the court found that President Trump's suspension of certain work visas during the pandemic would cause irreparable harm to businesses that could not "hire and retain qualified individuals from abroad." *Nat'l Ass'n. of Mrfs. v. U.S. Dep't of Homeland Sec*, 491 F. Supp. 3d 549, 569–70 (N.D. Cal. 2020). Here, the Cities' evidence shows that elevated turbidity may cause filter run times to decrease, which may require more frequent and additional maintenance. Pulley Decl. ¶¶ 9, 22; Buchanan Decl. ¶ 11. But the "money, time and energy necessarily expended" to handle this increased maintenance is "not enough" to establish irreparable harm. *Los Angeles Mem'l Coliseum Comm'n*. *v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980).

Separately, the City of Salem asserts that the increased *risk* of "non-compliance with CWA standards" constitutes irreparable harm warranting an injunction. City of Salem Br. at 25. Not so. A court is "not mechanically obligated to grant an injunction for every violation of" the Clean Water Act. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

Finally, Marion County and Santiam Water District claim likely irreparable harm will occur to irrigators and other downstream water uses from the failure to fully refill Detroit Reservoir. Mar. Cty. Br. at 36–37; Santiam Br. at 8–10. Again, neither of those plaintiffs have shown that result is *likely* to happen. The SEIS states that only in very dry years is it likely that the reservoir would not fully refill. SEIS at 219. But the chance of a very dry 2027 is speculative. Marion County and Santiam Water District state that a strong El Niño is predicted this fall and winter, which can result in dry conditions, but a strong El Niño can also result in warm, wet winters. *Forecast: What does a strengthening El Niño mean for Oregon this winter?* The Oregonian (August 20, 2026), https://reader.theoregonian.com/forecast-what-does-a-strengthening-el-nino-mean-for-oregon-this-winter/content.html (last visited September 17, 2026). Accordingly, it is entirely speculative that Detroit Reservoir would not fully refill after the drawdown this fall.

In contrast to Plaintiffs' speculative and non-irreparable harms, irreparable harm is *certain* to occur each and every year that a deep drawdown at Detroit Dam is delayed. Chinook juveniles migrating in the fall will experience much higher mortality passing through the powerhouse turbines than if they passed through the RO during a deep drawdown. *See* Schroeder Decl. ¶¶ 29–30 (describing a study that found passage survival through the powerhouse (turbines) was only 54% while passage through the regulating outlets ranged from 72–94%); *see also* 2024 BiOp at 5.6-422 to 432 (finding only 20% passage survival during past fall

operations); *supra* p. 10 (discussing results of recent deep drawdowns showing improved dam passage). Continued high mortality of fall migrants will impede an increase in the yearling life history form of North Santiam Chinook salmon and will prevent steelhead from using high quality habitat above the dam, which will hinder recovery of these populations. Schroeder Decl. ¶¶ 15–23, 40–44; *see also supra* pp. 8–9. North Santiam Chinook and steelhead are well below recovery goals and continue to decline. Schroeder Decl. ¶¶ 8–10. Thus, preventing the deep drawdown will clearly cause irreparable harm to this ESA-protected species. *See NEDC II*, 558 F.Supp.3d at 1064 (finding that the Corps' failure to implement RPA measures including downstream fish passage through deep drawdowns is causing "substantial, irreparable harm").

In sum, while Plaintiffs have failed to make the required "clear showing" that irreparable harm to their interests is likely, ample evidence shows that granting the injunction is certain to cause irreparable harm to UWR Chinook salmon.

## III. THE BALANCE OF HARDSHIPS FAVORS ESA SPECIES OVER ECONOMIC, RECREATION, AND IRRIGATION INTERESTS.

"Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 794 (9th Cir. 2005) (quoting *TVA v. Hill*, 437 U.S. 153, 194 (1978)). Thus, courts "may not use equity's scales to strike a different balance." *Id*. This is true even for remedies involving non-ESA claims. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 693 F.Supp.2d 1145, 1153 (E.D. Cal. 2010) (refusing to enjoin implementation of a biological opinion RPA measure despite finding NEPA violations because the court was "without authority to balance the equities" where harm to ESA-listed species was "imminent and occurring"); *see also Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 539 F.Supp.3d 543, 560 (D.S.C. 2021) (finding that the equities tipped in favor of ESA-listed species even though an

injunction was based on a non-ESA claim).

Accordingly, impacts to "local economies do not overcome the presumption that the balance of harms and public interest factors tip" in favor of ESA-listed species. *NEDC II*, 558 F.Supp.3d at 1066. Although undoubtedly burdens to Plaintiffs, the extra cost of water treatment and shortage of irrigation water do not outweigh harm to threatened UWR Chinook salmon. *Nat'l Wildlife Fed'n v. NMFS*, 831 F.Supp.3d 1012, 1043–44 (D. Or. 2026) (finding that even if the court had authority to balance the equities, "fears" about risks to drinking water and water supplies from changes to dam operations would not outweigh harm to ESA-listed salmonids and that regardless, mitigation measures and emergency response conditions would reduce such risks); *accord Nat'l Wildlife Fed'n v. NMFS*, No. 3:01-cv-0640-SI, 2017 WL 1829588, at *6 (D. Or. April 3, 2017), *aff'd*, 886 F.3d 803, 817 (9th Cir. 2018); *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d at 794. As this Court recently stated, "[i]mprovements that result in immediate increased survival of a listed species are given great weight in a court's equitable analysis." *Willamette Riverkeeper*, 2026 WL 2690278, at *15.

Ignoring this critical issue, Plaintiffs instead grasp at straws. Marion County argues, without citing any factual evidence, that the drawdown will *not* benefit UWR salmonids, Mar. Cty. Br. at 37–38, while the City of Salem suggests that other RPA measures are sufficient to protect the species. City of Salem Br. at 29. To the contrary, NMFS—the expert wildlife agency charged by Congress with managing and protecting ESA-listed salmonids—determined that the drawdown is necessary to improve fall migration of juvenile Chinook salmon, and in the future, juvenile steelhead if that population improves, which is important for maintaining life history diversity within these species—a critical component for their survival and recovery. *See supra* pp. 8–9; Schroeder Decl. ¶¶ 15–23, 40–44. The loss of these iconic species that have inhabited

the North Santiam River for millennia, and are part of the culture of all peoples who live in the Pacific Northwest, would be devastating. Given their highly imperiled status and continued declines, plus the increasing threats from climate change and human development, all actions to benefit the species are critical—including the Detroit deep drawdown.

Rather than spending money and resources fighting this critical measure, Plaintiffs should be spending it preparing for the drawdown. NMFS has been saying for almost twenty years that the Corps needs to implement downstream passage operations, and specifically added a Detroit deep drawdown to the RPA in the 2024 biological opinion. The Corps has indicated it is re-evaluating a structural passage solution at Detroit and thus this "interim" operation may become the long-term solution for fall migration. ROD at 2–3. Regardless, a structural solution would be years away, and these threatened fish need immediate help. *See NEDC II*, 558 F.Supp.3d at 1064 (finding that the Corps' failure to provide fish passage is causing "substantial, irreparable harm" that must be remedied). Continuing to delay the drawdown will impair efforts to reverse the species' trend toward extirpation, which would be unlawful. *See San Luis & Delta-Mendota Water Auth.*, 693 F.Supp.2d at 1151–52 (finding that "the authority of the court to issue an injunction against implementation of [a] BiOp based on a NEPA violation is limited" because an injunction may not "issue if it would cause a violation of another law, here the ESA").

**CONCLUSION**

For the foregoing reasons, Conservation Groups request the Court deny Plaintiffs' motions for preliminary injunction.

Dated: September 18, 2026

Respectfully submitted,

/s/Lauren M. Rule

Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
2512 SE 25th Ave., Suite 304
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

*Attorneys for Defendant-Intervenors*