UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARION COUNTY, *a Political Subdivision of the State of Oregon*,

Plaintiff,

And

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

U.S. ARMY CORPS OF ENGINEERS; DANIEL P. DRISCOLL, *in his official capacity as Secretary of the Army*; and WILLIAM H. GRAHAM, JR., *in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

Lead Case No. 6:26-cv-00956-MTK
Trailing Case No. 6:26-cv-1381-MTK

**OPINION AND ORDER**

CITY OF SALEM, *an Oregon Municipal Corporation*,

Plaintiff,

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

UNITED STATES OF AMERICA; UNITED STATES ARMY CORPS OF ENGINEERS, *an agency of the United States government*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

**KASUBHAI,** United States District Judge:

Plaintiffs Marion County and the City of Salem brought these actions for violations of the Administrative Procedure Act (“APA”), 5 U.S.C. §§ 701–706, challenging Defendants’ decision to conduct an annual deep drawdown of Detroit Reservoir on the North Santiam River. The Court consolidated the cases and granted motions to intervene filed by Plaintiff-Intervenors Santiam Water Control District and City of Stayton and Defendant-Intervenors Northwest Environmental Defense Center and the Native Fish Society. *See* ECF Nos. 28, 42. Before the Court are Plaintiffs’ Motions for Preliminary Injunction, ECF Nos. 18, 51, and Plaintiff-Intervenors’ Joinders, ECF Nos. 55, 58. For the reasons below, the motions are denied.

## BACKGROUND

Defendant U.S. Army Corps of Engineers ("the Corps") owns, operates, and maintains the Willamette Valley System ("WVS"), a large network of 13 dams and reservoirs, hatcheries, adult fish facilities, and bank protection structures on various tributaries in the Willamette Valley River basin. Pulley Decl. Ex. D ("SEIS"), ECF No. 52-4. At issue in this case is Defendants' decision to conduct annual deep drawdowns of Detroit Reservoir, located in the North Santiam River subbasin of the WVS, in order to allow for volitional passage of Endangered Species Act ("ESA")-listed Upper Willamette River Chinook salmon ("UWR Chinook") past the Detroit Dam. The Court begins with an overview of the relevant legal framework before turning to the factual background.

### I. Legal Framework

#### A. Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). When enacted, the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA charged the National Marine Fisheries Service and the Fish and Wildlife Service (collectively, "the Services") with administering the ESA. Under Section 4 of the ESA, the Services are directed to list endangered and threatened species, and to designate critical habitat for those species. 16 U.S.C. § 1533.

Under Section 7 of the ESA, federal agencies ("action agencies") are required to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the

destruction or adverse modification of [critical habitat].” 16 U.S.C. § 1536(a)(2). The action agency must consult with the relevant Service in making such a determination. If either the action agency or the relevant Service “determines that the proposed action is ‘likely to adversely affect’ a listed species or habitat, formal consultation is required.” *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014) (quoting 50 C.F.R. § 402.14). In formal consultation, the relevant Service prepares a Biological Opinion which includes, among other things, “[t]he Service’s opinion on whether the action is . . . [l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.” 50 C.F.R. § 402.14(h)(1)(iv)(A). If the Service concludes that “take” will not jeopardize the listed species, it will provide an “Incidental Take Statement” that sets forth the terms and conditions of such allowable take. 16 U.S.C. § 1536(b)(4)(c)(i); 50 C.F.R. § 402.14(i). The action agency must reinitiate consultation immediately if it exceeds the permissible amount of incidental take. 50 C.F.R. § 402.14(i)(5), 402.16(a)(1).

Section 9 prohibits the “take” of listed species, which means “to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.” 16 U.S.C. § 1538(a)(1), 1532(19). An Incidental Take Statement operates as a safe harbor from otherwise impermissible take, but the action agency or applicant is no longer insulated from Section 9 liability “where an action agency does not reinitiate consultation with the [Service] despite the failure of promised conservation measures.” *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012). The ESA includes a citizen-suit provision empowering citizens to sue any person who violates the ESA and its implementing regulations. 16 U.S.C. § 1540(g).

### B. National Environmental Policy Act

The purpose of the National Environmental Policy Act ("NEPA") is to require agencies to disclose "relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). It "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). To that end, NEPA requires agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed statement—an Environmental Impact Statement ("EIS")—discussing environmental impacts of the proposed action and a range of alternatives to avoid adverse impacts. 42 U.S.C. § 4332(C).

## II. Factual Background

Defendants intend to conduct annual deep drawdowns of the Detroit Reservoir "to increase survival for juvenile ESA-listed fish as they migrate downstream." SEIS 19. The drawdown decision follows litigation in which the Corps was sued for causing "take" of ESA-listed salmonids in their operation of the WVS. The Court begins with a summary of that litigation and its outcomes before turning to Defendants' decision to proceed with annual drawdowns of the Detroit Reservoir and Plaintiffs' concerns about the impacts of that decision.

### A. Prior Litigation and Outcomes

A 2008 BiOp issued by the National Marine Fisheries Service ("NMFS") assessed the operation and maintenance of dams and related facilities in the WVS and their effect on ESA-listed UWR Chinook and steelhead. *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs* ("*NEDC*"), 479 F.Supp.3d 1003, 1008-09 (D. Or. 2020). The 2008 BiOp found that "the dams harmed the listed salmonids by, among other things, blocking downstream passage of juvenile

salmonids, interfering with upstream migration of salmonids returning to their spawning grounds, and harming water quality and quantity downstream from the dams." *Id.* at 1009. The 2008 BiOp set out certain mitigation measures that the Corps was required to carry out to continue operating the WVS without causing jeopardy to the ESA-listed salmonids. *Id.* at 1009-10. In 2018, the Northwest Environmental Defense Center, the Native Fish Society, and other conservation groups sued the Corps related to its operation of the WVS.

1. *NEDC* Decision

In *NEDC*, the plaintiffs alleged that the Corps failed to implement the mitigation measures required by NMFS' 2008 BiOp to protect ESA-listed UWR chinook and steelhead, caused a "take" of ESA-listed species, and failed to reinitiate formal ESA consultation with NMFS. On summary judgment, the court ruled in favor of the plaintiffs, concluding that the Corps violated Section 7(a)(2) and Section 9 of the ESA. *NEDC*, 479 F.Supp.3d at 1019, 1023; Pulley Decl. Ex. E at 3, ECF No. 52-5. The court ordered the defendants to complete ESA re-consultation and ordered NMFS to issue a new BiOp by December 31, 2024. *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs* ("*NEDC II*"), 558 F.Supp.3d 1056, 1076-77 (D. Or. 2021). The court also issued an interim injunction requiring numerous operational changes in the WVS to afford relief until the completion of the 2024 BiOp. *Id.*

2. Deep Drawdowns

Among the interim operational measures the court ordered in *NEDC II* were "deep drawdowns" of certain reservoirs in the WVS. *Id.* at 1077-78. Judge Hernandez explained the necessity of those measures as follows:

> Juvenile salmonids must pass through the dams to successfully outmigrate to the marine environment. The salmonids typically navigate downstream by following the flow of the river; however, the large, slow-moving reservoirs behind the dams disrupt these natural outmigration cues, making it difficult for the fish to find their way downstream to the dam and lengthening their exposure to predators and

> pathogens in the reservoirs. Increasing flow via drawdowns and spill operations reduces the size of the reservoir and accelerates the salmonids' navigation to the dam, thereby decreasing their exposure to pathogens and predators. But once the juvenile salmonids reach the dams, they can only pass downstream through the hydropower turbines, regulating outlets ("ROs"), or spillways. For likely obvious reasons, significantly higher fish mortality occurs when the juvenile salmonids pass through the turbines instead of the ROs or spillways, making non-turbine fish passage the safest available option. And, concerning drawdowns specifically, juvenile salmonids are surface-oriented fish, meaning they cannot sound very deep and are unlikely to find the ROs unless the reservoir surface elevation is drawn down within 20 to 25 feet of the outlet opening.

*Id.* at 1064-65.

As a result of the interim injunction, the Corps implemented a deep drawdown of the Green Peter Reservoir to allow for fall juvenile fish passage through Green Peter Dam. NFS Resp. Ex. 3, ECF No. 66-3. During the initial drawdown in November 2023, the Corps drew the Green Peter Reservoir down 142 feet in one month. SEIS 19. The drawdown of the Green Peter Dam exposed sediment that substantially increased turbidity in the South Santiam River, resulting in operational disruptions at water treatment plants in the Cities of Lebanon and Sweet Home. Page Decl. ¶ 7, ECF No. 21; Pulley Decl. Ex. B at 7, ECF No. 52-2; FSEIS at 19. In addition, the drawdown caused the death of thousands of kokanee salmon, a non-ESA-listed salmonid. Teed Decl. Ex. 3 at 2, ECF No. 25-3.

Following the issues caused by the 2023 Green Peter Reservoir drawdown, the Corps moved to amend its implementation plan for future fall deep drawdowns of the Green Peter Reservoir, which the court granted over objections from downstream cities concerned that the modifications would not adequately address the turbidity concerns. NFS Resp. Exs. 11, 12, ECF Nos. 66-11, 66-12. The drawdown of Green Peter Reservoir that occurred the following fall, in 2024, resulted in less turbidity both in level and duration. Schroeder Decl. ¶ 35, ECF No. 67. Lower turbidity was attributed to a later drawdown start date and reduced sediment volume following the 2023 drawdown. *Id.* Deep drawdowns of other reservoirs within the WVS have

also taken place due to the interim injunction. For example, the Corps conducted drawdowns of Lookout Point and Dexter Dams in the Middle Fork Willamette River in 2023 and 2024, noting that turbidity levels were significantly lower in 2024 as compared to 2023, "suggest[ing] that the river cut through most of the sediment accumulated in the upper portions of the reservoir during the first year of drawdown." NFS Resp. Ex. 9, ECF No. 66-9.

As a result of the turbidity issues caused by the 2023 Green Peter Reservoir drawdown, Congress enacted legislation that required the Corps to submit a report analyzing instances of high turbidity resulting from drawdown of WVS reservoirs, and identifying lessons learned and opportunities to minimize economic impacts of turbidity on non-Federal entities. 33 USC Section 1205(b) ("WRDA"). Although the report was due to Congress by January 4, 2026, the Corps has not yet submitted it. Def. Opp'n 8-9, ECF No. 68. The Corps has no estimated date for completion of the report, and notes that "its completion is contingent on the availability of funding." Def.'s Notice Re WRDA 5, ECF No. 79.

3. <u>2024 Biological Opinion</u>

In December 2024, NMFS issued its new Biological Opinion for the continued operation of the WVS. NFS Resp. Ex. 2 ("2024 BiOp"), ECF No. 66-2. As relevant to this litigation, the 2024 BiOp instructed the Corps to "test and improve effectiveness of interim juvenile fall drawdown operations through Detroit and Big Cliff Reservoirs and Dams . . . 2025-2028," including "[i]n the fall, draw Detroit reservoir elevation down to no more than 50 feet above upper RO for passage (1395 ft), when possible given hydrology and hydropower activity in the North Santiam and other subbasins." 2024 BiOp 6.4-524. The BiOp explained that the rationale was to increase the "possibility for RO outlets to be accessible by lowering reservoir elevations" to increase survival for juvenile migrants. *Id.*

**B. Detroit Reservoir Drawdown**

Following the issuance of the 2024 BiOp, the Corps prepared a Supplemental Environmental Impact Statement ("SEIS") for WVS operation and maintenance. The SEIS included "revisions to the Interim Operations including a late fall/early winter deep drawdown for downstream fish passage at Detroit Dam" based on the 2024 BiOp. SEIS xiv. The Detroit Reservoir drawdown is part of a series of interim operations that would take place until the long-term solution for downstream fish passage and water temperature management is operational. SEIS 19.

Under the SEIS, the Corps plans to use a gradual approach over several years to reach the target elevation of 1395 feet. Tackley Decl. ¶ 6, ECF No. 69; SEIS 19, 80, 137. "[I]n late November or early December" 2026, the Corps intends to lower the reservoir 30 feet to 1425 feet over the course of two weeks, and then hold the reservoir at that elevation for another two weeks. SEIS 19. The Corps noted that the Detroit Reservoir has reached this level twice before, "for low flow augmentation (2015) and spillway gate maintenance (2019)." SEIS 19. The Corps would then use the turbidity information from each year to make informed decisions about how much to "lower the reservoir . . . each year until reaching 1395 feet." SEIS 19; Tackley Decl. ¶ 7.

As required by NEPA, the Corps solicited public comment before finalizing its SEIS. SEIS 14. The public comment period ran from November 14, 2025, to January 13, 2026. SEIS at ES-2. The Corps received input from affected stakeholders including tribes, state and federal agencies, and the public, which it used to shape its evaluation of the impact of the interim operations. SEIS 14-15. The Corps received extensive feedback about the proposed drawdown at Detroit Dam, specifically, the drawdown's "effects on water quality, municipal water supplies, recreation, and kokanee populations." SEIS 15. After the comment period, the Corps updated the Final SEIS based on comments, specifically to shape the interim operation to minimize adverse

effects such as turbidity. SEIS 216-18. The Corps indicated it would use real time turbidity data to modify, pause, or cease the drawdown to avoid unacceptable adverse impacts to drinking water systems and practice strong communication with the State of Oregon, as well as the Cities of Salem, Stayton, and Gates. SEIS 218.

The SEIS acknowledges that drawing down the Detroit Reservoir will increase turbidity because it will leave more of the reservoir bank exposed, increasing the potential for shoreline erosion and sloughing. SEIS 92. However, the SEIS concludes that the downstream turbidity effects are expected to lessen in severity after a few years as the sediment reaches a new equilibrium. SEIS 92. In response to specific comments raised comparing the proposed drawdown to the Green Peter Reservoir drawdown, the Corps explained that it expects the Detroit Reservoir drawdown to "result in much lower levels of turbidity than on the South Santiam during the Green Peter drawdown in 2023 and 2024." SEIS 218.

Defendants have finalized and circulated a "Deep Drawdown Emergency Response Communications Plan" for planned deep drawdowns, including Detroit Reservoir. ECF No. 77-1. The Plan provides for regular meetings with stakeholders "to discuss real-time and forecasted (expected future) dam operations and reservoir level information." *Id.* at 2. It provides that "[i]f drinking water facility concerns arise, the impacted city will contact OHA, who will consider whether to ask for a halt of operations according to . . . criteria." *Id.* at 3. The Corps will not take action to halt the drawdown "unless requested by the Oregon Governor's Office or unless a drinking water emergency has been determined." *Id.* The plan does not provide a timeframe for how long it would take to pause or halt the drawdown in the event of an emergency.

**C. Plaintiffs' Asserted Irreparable Harm**

Plaintiffs each present evidence and argument that the Detroit Reservoir deep drawdown will cause them irreparable harm. Because each Plaintiff raises concerns unique to their own interests, the Court summarizes them each separately.

1. City of Salem

The City of Salem operates the Geren Island Water Treatment Plant ("the Facility"). Pulley Decl. ¶ 3, ECF No. 52. The Facility is the primary regional drinking water source in the Mid-Willamette Valley. Pulley Decl. ¶ 4. Salem supplies drinking water to approximately 220,000 individuals, hospitals, schools, businesses, firefighting and emergency services, and is the sole emergency source of drinking water for both the City of Stayton and the City of Keizer. Pulley Decl. Ex. C at 2-3, ECF No. 52-3; Pulley Decl. ¶¶ 5-6.

The Facility uses slow sand filtration and draws water from the North Santiam River downstream of Detroit Dam. Pulley Decl. ¶ 3; Pulley Decl. Ex. C at 3. The plant passes the raw river water through several layers of sand, trapping contaminants in a biologically active surface layer, to produce clean drinking water. Pulley Decl. ¶ 9. The intake water must have low levels of turbidity for the slow sand filtration process to work effectively and prevent damage to the filters. Pulley Decl. Ex. C at 4.

Turbidity in the North Santiam River is naturally low, typically below 10 Nephelometric Turbidity Units ("NTUs"). Pulley Decl. ¶ 9. Salem conducted pilot testing which found that high levels of turbidity in the water affects the ability of the Facility's filters to work correctly, threatening the long-term viability of the water system. Pulley Decl. Ex. F at 13-14, ECF No. 52-6; Pulley Decl. Ex. C at 4-5. The testing demonstrated that filters at the facility ran for 67 days with turbidity at 10 NTU, 14-38 days at 20 NTU, 14-18 days at 30 NTU, 11-12 days at 40 NTU, and 8-13 days at 50 NTU. Pulley Decl. Ex. F at 6. Salem cites empirical data from previous

drawdown actions of the Green Peter Reservoir and asserts that the Detroit Drawdown "will likely increase the concentration of suspended solids and fine particles in the river well above 50 NTU" and therefore imperil drinking water and impact Salem's ability to fight fires. Pulley Decl. ¶¶ 11, 13, 22. In addition, when turbidity exceeds 10 NTUs, Salem "may be required" to shut down the Facility to prevent damage to the filters. Pulley Decl. ¶ 7. If Salem shuts down the Facility, it would be forced to rely on backup sources with no operational redundancy like "groundwater wells, stored reservoir water, and emergency interties with the City of Keizer and Stayton." Pulley Decl. ¶ 7.

2. Marion County

Detroit Dam and Reservoir are located in Marion County, which has a population of over 340,000 residents. Amerman Decl. ¶ 3, ECF No. 20; Elzinga Decl. ¶ 11, ECF No. 27. Plaintiff Marion County notes that the North Santiam River, into which water released from the Detroit Dam flows, is a key source of irrigation and drinking water in the County. Marion County asserts that increased turbidity and inadequate refill of the Detroit Reservoir after the drawdown will cause it irreparable harm.

On the issue of water quantity, Marion County presents evidence that in the event Detroit Reservoir is unable to refill, it or its residents will suffer harm. During a dry winter, the Detroit Reservoir is less likely to rise to the conservation pool level. Elzinga Decl. ¶ 15. If the water does not reach marinas in the reservoir or there were significant fish death, boating, fishing, recreation rentals, campground use, and income from park use, would be adversely impacted. O'Donnell Decl. ¶ 8, ECF No. 22; Lunski Decl. ¶ 7, ECF No. 23; Nicholas Decl. ¶ 5, ECF No. 24. By way of example, Marion County notes that in 2015, when Detroit Reservoir was unable to refill as it would under normal weather patterns, "[t]ourism heavily declined, docks had to move out, and during the annual 'free fishing' weekend in June, there wasn't even enough water to allow for

fishing." Elzinga Decl. ¶ 15. Given that a "very strong" El Niño event is predicted for this fall and winter—which typically result in warmer and drier seasons—Marion County asserts that the likelihood of inadequate refill is particularly high this year. Elzinga Decl. ¶¶ 13-14.

Like Salem, Marion County is also concerned that the drawdown will affect water treatment plants serving Marion County residents and harm downstream water quality. Page Decl. ¶ 15; O'Donnell Decl. ¶ 12. Marion County notes that safe drinking water is necessary not only for its residents but also for the operation of Marion County schools and hospitals. Marion County's Mot. 13, ECF No. 18 (citing SEIS at W-306-07). Also like Salem, Marion County points to the turbidity issues caused by the Green Peter Reservoir drawdown as evidence of the level of turbidity it fears the Detroit Reservoir drawdown will cause. *See* Amerman Decl. ¶¶ 11-13; Page Decl. ¶ 7; Lunski Decl. ¶ 6.

3. City of Stayton

The City of Stayton is a municipal corporation with a population of just over 8,000 people. Hajduk Decl. ¶ 3, ECF No. 60. Stayton provides drinking water to Santiam Hospital and North Santiam School District and provides wastewater treatment and disposal to the City of Sublimity. Mot. Intervene Ex. 3 ¶¶ 8, 11, ECF No. 41-3; Loving Decl. ¶¶ 6-7, ECF No. 62; Hajduk Decl. ¶ 9; Taylor Decl. ¶ 4, ECF No. 61. Stayton's water supply comes exclusively from the North Santiam River downstream of the Detroit Dam and Reservoir. Buchanan Decl. ¶ 7, ECF No. 59. Like Salem's water treatment plant, Stayton's plant uses slow sand filtration to treat the water. Buchanan Decl. ¶ 7. Stayton notes that sustained turbidity within the North Santiam River will lead to frequent cleaning or possible replacement of its water treatment plant's filters, "put[ing] Stayton's drinking water treatment system and the residents and other users who depend on the proper functioning of that system at risk of not only reduced or limited water

availability but also closure of all the public services, hospitals, schools and other functions that depend on the availability of clean water." Buchanan Decl. ¶¶ 11-13.

4. Santiam Water Control District

The Santiam Water Control District ("District") is a municipal corporation. District Intervenors Compl. ¶ 1, ECF No. 46. The District receives water from the North Santiam River and operates an 114-mile irrigation system extending from Stayton to Salem. Stevenson Decl. ¶ 2, ECF No. 39. This system delivers water to over 17,000 acres of agricultural land, and provides water to hydroelectric plants, wetland restoration projects, and municipal governments. Stevenson Decl. ¶¶ 3, 5. Nearly 1,000 acres of farmland depend on stored water from the District for irrigation, and the District is the sole source of irrigation for 580 of those acres. Am. Stevenson Decl. ¶ 3, ECF No. 63. Loss of irrigation to those crops "can quickly reduce yields and, if sustained, kill the plants." Am. Stevenson Decl. ¶ 4.

Santiam is concerned about the impacts of both high turbidity and inadequate reservoir refill. On the issue of turbidity, the District's water conveyance system includes "fish screens and fish barrier structure[s]." Stevenson Decl. ¶ 11. During a high turbidity event, sediment increases and builds up on the fish barriers requiring extra excavation and increasing operations costs. Stevenson Decl. ¶ 11. The District is further concerned that in dry years, the drawdown will cause inadequate reservoir refill, preventing the District from fulfilling its delivery obligations for irrigation water. Am. Stevenson Decl. ¶ 2. During a past El Niño year—as this year is expected to be—"Detroit Reservoir [was left] well below full pool, and thus the District was very worried about stored water supply that year." Am. Stevenson Decl. ¶ 5.

**STANDARD**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20, 22 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter* did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (quotation marks omitted). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## DISCUSSION

Plaintiffs and Plaintiff-Intervenors contend that they satisfy the *Winter* test and ask the Court to grant preliminary injunctive relief. Plaintiff Marion County seeks injunctive relief that compels the Corps to complete the WRDA report, compels Defendants to withdraw the decision to conduct annual drawdowns of Detroit Reservoir, and prohibits Defendants from conducting any drawdowns until they have completed a new SEIS in compliance with all applicable laws. Plaintiff City of Salem seeks an order barring Defendants from initiating or proceeding with a deep drawdown of Detroit Reservoir until there is a final decision on the merits of this case. In the alternative, Plaintiff City of Salem seeks a preliminary injunction requiring Defendants to

immediately cease the planned drawdown below 1,450 feet if turbidity levels reach 10 NTUs or more, and to refrain from any further drawdown until turbidity levels fall below 10 NTUs. The Plaintiff-Intervenors join in both motions, seeking the same relief.

The Court cannot order the requested relief because Plaintiffs and Plaintiff-Intervenors have not offered sufficient evidence to meet their burden to show that irreparable harm is likely in the absence of the relief they seek. Even assuming without deciding that Plaintiffs and Plaintiff-Intervenors have met their burden to show a likelihood of success on the merits, that the balance of equities weighs in their favor, and that an injunction is in the public interest, they are not entitled to the "extraordinary remedy" of a preliminary injunction because they have not made a "clear showing" that irreparable harm is likely. *Winter*, 555 U.S. at 22.

A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Subjective apprehensions and unsupported predictions" are insufficient to satisfy the moving party's burden to show a likelihood of irreparable harm. *Id.* at 675-76.

The Court begins its analysis by acknowledging that the ultimate harm Plaintiffs and Plaintiff-Intervenors discuss in their motions, should it occur, is undoubtedly irreparable. Plaintiffs' and Plaintiff-Intervenors' motions are supported by evidence of the profound impact that a loss of drinking water would have on hundreds of thousands of residents as well as hospitals, schools, businesses, and industries. Likewise, the record explains the impact of inadequate reservoir refill on necessary irrigation as well as industrial, recreational, and environmental uses of the water stored in the Detroit Reservoir. The problem for Plaintiffs'

motions, however, is that Plaintiffs fail to show that the proposed drawdown is likely to cause that harm.

With respect to turbidity, Plaintiffs rely on two general bodies of evidence: data showing the effects high turbidity levels would have if such turbidity was sustained over various periods of time; and evidence of what happened during drawdowns of other reservoirs, especially the Green Peter Reservoir in 2023. Plaintiffs essentially argue that those two categories of evidence together are enough for this Court to find it likely that the turbidity experienced following the Green Peter Reservoir drawdown will likewise occur as a result of the proposed 2026 drawdown of Detroit Reservoir, which would cause the harm discussed above. But Plaintiffs have failed to "connect the dots" by explaining and supporting with scientific evidence why the deep drawdown here will produce the same or similar turbidity effects seen at Green Peter or indeed any specific level of turbidity for any specific period of time.

As noted in the SEIS and other documents in the record, there are significant differences between the 2023 drawdown of the Green Peter Reservoir and the drawdown the Corps proposes at the Detroit Reservoir. In particular, as compared to the Green Peter Reservoir drawdown, the Detroit Reservoir drawdown (1) will expose much less sediment; (2) involves a drawdown to a level that the reservoir has been drawn down to twice before in recent years; and (3) will occur later in the year. The record suggests that each of these three factors would result in less turbidity than occurred as a result of the Green Peter Drawdown. The Court is therefore left with a record that suggests turbidity is likely to occur at some level, and that level is likely to be less than experienced as a result of the Green Peter Drawdown, but contains no way for the Court to discern what level of turbidity is actually expected as a result of the Detroit Reservoir drawdown and for how long. In other words, there is no site-specific analysis or data that shows turbidity

will reach damaging levels for any particular length of time. Without such information in the record, the Court cannot find that the drawdown is likely to cause the harm Plaintiffs identify in their motions.

At oral argument, citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011), counsel for Plaintiff City of Salem suggested that because of the magnitude of the potential harm, a lesser showing of its likelihood is required. Tr. 175:12-176:12. Given the public health risks at issue in depriving thousands of residents of drinking water, Salem contends that "even a threat [to that supply] is enough to find irreparable harm." Tr. 175:12-17. While that idea has an inherent and appealing logic to it, it is not the law. The irreparable harm element requires a party to "demonstrate a significant threat of irreparable injury, *irrespective of the magnitude of the injury*." *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (emphasis added). A similar sliding scale approach to the one Plaintiff City of Salem now urges is precisely what the U.S. Supreme Court rejected in *Winter*. *All. for the Wild Rockies*—the case Salem cited for the proposition that the magnitude of the harm mitigates the need to show a high probability that the harm will occur—only confirms that *Winter* "explicitly rejected" the Ninth Circuit's prior holding that a "'possibility' of irreparable harm was sufficient, in some circumstances, to justify a preliminary injunction." *All. for the Wild Rockies*, 632 F. 3d at 1131. Though the Court recognizes the gravity of the harm Plaintiffs allege could occur if turbidity reaches the level Plaintiffs fear it will, the law prohibits the Court from finding that the degree of that harm mitigates Plaintiffs' need to show its likelihood to occur.

On the issue of refill of the Detroit Reservoir, that harm is likewise speculative on the record before the Court because Plaintiffs fail to demonstrate that inadequate refill is likely to occur. Plaintiff Marion County and Plaintiff-Intervenor Santiam Water Control District both note

that this year's predicted El Niño event makes it more likely than the average year that the Detroit Reservoir will fail to refill to normal levels as quickly as desired because such years tend to yield drier fall and winter seasons. But "more likely than usual" does not tell this Court how likely it is to happen at all, as compared to a normal year or otherwise. While Marion County's motion notes that rainfall fails to sufficiently replace water in Detroit Reservoir "one in four years," it fails to cite to any evidence supporting that proposition. Marion County Mot. 36. During oral argument, counsel for Marion County directed the Court to a graph in an appendix to the SEIS for its "one in four years" assertion. Tr. 145:15-146:10; NFS Resp., ECF No. 66. While that appendix is not in the record, the Court located it and the graph at page B-358 on the Corps' website.[1] The Court is unsure that the graph shows what Marion County asserts that it shows, but in any event, a 25% likelihood—even when bolstered by the amorphous prospect of a strong El Niño event—fails to show "likelihood." Without meaningful and interpretable data on expected rainfall coupled with evidence of what length and severity of inadequate refill is likely to result in the harm Plaintiffs allege, the Court cannot find that such harm is likely.

Finally, the Court notes that the emergency plan in place for the drawdown provides a mechanism by which the drawdown may be paused or halted in the event that the State of Oregon "has data and/or information demonstrating that the affected Public Water System is at high risk of failing to provide adequate water (water quantity) or to meet regulatory requirements for safe drinking water (water quality)" if the halt would help remedy or ease the problem. Deep Drawdown Emergency Response Communications Plan 2. While this Court finds for the reasons

---

[1] *Willamette Valley System Operations and Maintenance, Appendix B: Hydrologic Process Technical Information,* US ARMY CORPS OF ENGINEERS (2025), https://publibrary.sec.usace.army.mil/api/download?id=d921d01f-aab9-4224-b3a7-4a813728b3b0&filename=USACE%20WVS%20FSEIS_Appendix%20B_Hydrologic%20Processes_May2026.pdf&token=&preview=true

outlined above that Plaintiffs fail to show a likelihood of irreparable injury regardless of the existence of this plan, the emergency plan provides an additional reason to deny the motions because Plaintiffs fail to demonstrate why the plan is inadequate to prevent the harm from occurring.

The Court shares Plaintiffs' concerns about the threats posed by the possibility of high turbidity and inadequate refill to their interests, and to the interests of the many people, communities, and businesses that rely on a clean and adequate water supply from the North Santiam River downstream of the Detroit Dam and Reservoir. But "possibility" is not "likelihood," and the law requires parties seeking injunctive relief to demonstrate that the irreparable harm they fear is "likely" to occur. Plaintiffs fail to make that showing here and their motions are therefore denied without reaching the other elements of the *Winter* test. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (explaining the court need not address remaining elements where moving party fails to demonstrate likelihood of irreparable harm). However, Plaintiffs have leave to file renewed motions for injunctive relief either during the 2026 drawdown or prior to the 2027 drawdown, should new facts and data—specific to the Detroit Reservoir drawdown—support it.

**CONCLUSION**

For the reasons discussed above, the parties' Motions for Preliminary Injunction (ECF Nos. 18, 51, 55, 58) are DENIED without prejudice to renewed motions for injunctive relief as explained in this Opinion and Order.

DATED this 4th day of November 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge